Richard M. Lorenzen (#006787)
**PERKINS COIE** LLP
2901 N. Central Avenue, Suite 2000
Phoenix, AZ  85012-2788
RLorenzen@perkinscoie.com
Telephone:  602.351.8000
Facsimile:  602.648.7000

Counsel for Debtor, C.M.B. III, L.L.C.


# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 |
| C.M.B. III, L.L.C., | Case No. 2:10-BK-30496-GBN |
| Debtor. | **FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S PLAN OF REORGANIZATION** |

**TABLE OF CONTENTS**

**Page**

I.    EXECUTIVE SUMMARY ............................................................................1
      A.    Introduction ................................................................................1
      B.    Definitions and Plan Supremacy ...............................................1
      C.    Plan Materials ............................................................................2
      D.    The Disclosure Statement Approval ..........................................3
      E.    Voting Procedure .......................................................................3
      F.    Confirmation of Plan .................................................................4
II.   DISCLAIMERS ......................................................................................4
III.  DEBTOR'S HISTORY AND BUSINESS BACKGROUND ...............5
      A.    History of CMB .........................................................................5
      B.    Business of Debtor .....................................................................7
      C.    Related Party Transactions and Appointment of Trustee .........7
IV.   THE BANKRUPTCY CASE ..................................................................8
      A.    Events Leading to Bankruptcy ..................................................8
      B.    Official Committee of Unsecured Creditors ..............................9
      C.    Funding for Postpetition Obligations ........................................9
      D.    Postpetition Operations .............................................................9
            1.    Cash Collateral ................................................................9
            2.    Management .....................................................................10
      E.    Other Important Developments ................................................10
            1.    Union Opposes CMB's Use of Cash Collateral ...............10
            2.    Union's Single Asset Debtor Motion ...............................11
            3.    Union's Motion to Dismiss ..............................................11
            4.    Union's Motion for Relief From the Automatic Stay .........11
            5.    CMB's Efforts to Extend Expiring Leases .......................12
      F.    Settlement Efforts ....................................................................13
V.    ASSETS AND LIABILITIES ................................................................13
      A.    Assets .......................................................................................13
      B.    Liabilities ................................................................................13
            1.    Secured Claims ...............................................................13
            2.    Administrative Expense Claims .......................................14
            3.    Priority Claims ................................................................14
            4.    Unsecured Claims ...........................................................14

**TABLE OF CONTENTS**
**(continued)**

VI.   DESCRIPTION OF THE PLAN ..................................................................14

    A.   Classification and Treatment of Claims and Equity Interests.........................15

        1.   Classification Generally.................................................15

        2.   Unclassified Claims......................................................15

        3.   Classified Claims .........................................................16

    B.   Plan Funding ...............................................................21

    C.   Distributions to Creditors..................................................21

        1.   Distributions Generally..................................................21

        2.   Undeliverable or Unclaimed Distributions ..........................22

        3.   Time Bar for Cashing Distribution Checks .........................22

        4.   Limitations on Amending Claims ....................................23

    D.   Executory Contracts and Unexpired Leases ..........................23

VII.  THE REORGANIZED DEBTOR .................................................23

    A.   Ownership and Management ...........................................23

        1.   Interest Holders ..........................................................23

        2.   Management ...............................................................23

    B.   Financial Projections......................................................23

VIII. VOTING ON THE PLAN .........................................................24

    A.   Voting Eligibility .........................................................24

    B.   Voting Deadline ...........................................................25

    C.   Acceptance By a Class ...................................................25

    D.   Voting Procedures ........................................................25

        1.   Submission of Ballots ..................................................25

        2.   Incomplete Ballots ......................................................26

        3.   Withdrawal or Change of Votes ......................................26

        4.   Voting Multiple Claims ................................................26

IX.   CONFIRMATION OF THE PLAN..............................................27

    A.   Confirmation Hearing ...................................................27

    B.   Deadline for Objecting to Confirmation ..............................27

    C.   Requirements for Confirmation ........................................27

        1.   Confirmation Requirements Generally...............................27

        2.   Feasibility .................................................................27

        3.   Best Interests of Creditors.............................................28

D. Confirmation Over Dissenting Class ..............................................................29

1. Fair and Equitable ..............................................................29

2. Unfair Discrimination ..............................................................31

E. Effects of Confirmation ..............................................................31

1. Vesting of Estate Property ..............................................................31

2. Discharge ..............................................................31

3. Exculpation ..............................................................31

4. Effect on Insurance Policies ..............................................................32

X. ALTERNATIVES TO THE PLAN ..............................................................32

XI. RISK FACTORS ..............................................................32

XII. FEDERAL TAX CONSEQUENCES OF THE PLAN ..............................................................33

A. Scope of Discussion ..............................................................34

B. Tax Consequences to the Reorganized Debtor ..............................................................34

1. Cancellation of Debt and Reduction of Tax Attributes ......................34

C. Tax Consequences to Holders of General Unsecured Claims ........................35

1. Gain or Loss ..............................................................35

XIII. CONCLUSION AND RECOMMENDATION ..............................................................36

C.M.B. III, L.L.C., (the "<u>Debtor</u>", "<u>CMB</u>") submits this First Amended Disclosure Statement in connection with its Plan of Reorganization (the "<u>Plan</u>"). The purpose of this Disclosure Statement is to set forth information that (i) summarizes the Plan and alternatives to the Plan, (ii) informs creditors and interest holders of the treatment to be afforded their claims and equity interests in Debtor under the Plan, (iii) assists creditors entitled to vote in making informed decisions as to whether they should vote to accept or reject the Plan, and (iv) assists the Court in determining whether the Plan complies with the provisions of Chapter 11 of the Bankruptcy Code and should be confirmed. The Plan describes how all claims against and equity interests in Debtor will be resolved, and provides the means by which CMB will be reorganized under the Bankruptcy Code.

## I.    EXECUTIVE SUMMARY

### A.    Introduction.

On September 23, 2010 (the "<u>Petition Date</u>"), CMB filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Arizona (the "<u>Bankruptcy Court</u>" or the "<u>Court</u>"). Since then, CMB has managed its properties and affairs as debtor in possession. On February 7, 2011, CMB filed its Plan of Reorganization with the Bankruptcy Court. This Disclosure Statement describes certain aspects of the Plan, CMB's business operations, significant events that occurred in the Bankruptcy Case, and related matters. This Executive Summary is intended solely as a summary of the distribution provisions of the Plan and certain matters relating to the plan confirmation process. For a more complete understanding of the Plan, you should read this Disclosure Statement, the Plan, and the exhibits thereto in their entirety.

### B.    Definitions and Plan Supremacy.

All terms defined in the Plan will have the same meanings when used in this Disclosure Statement. Terms defined in this Disclosure Statement which are also defined in the Plan are solely for convenience and CMB does not intend to change the definitions of those terms in the Plan. Furthermore, in the event of any inconsistency between the Plan and

this Disclosure Statement, the Plan will control. The exhibits attached to this Disclosure Statement are incorporated into and are a part of this Disclosure Statement.

## C. Plan Materials.

CMB is mailing the following items to those creditors entitled to vote and certain other parties, either paper copies or a CD-ROM containing the following:

1. A copy of the "Order (I) Approving Disclosure Statement; (II) Fixing The Record Date; (III) Approving the Notice and Objection Procedures in Respect of Confirmation of the Plan of Reorganization; (IV) Approving Solicitation Packages and Procedures for Distribution Thereof; and (V) Approving the Form of Ballot and Establishing Procedures for Voting on the Plan of Reorganization," as entered by the Bankruptcy Court on _____ (the "Disclosure Statement Order");

2. The Notice (I) of Approval of Disclosure Statement, (II) Establishment of Record Date, (III) Hearing on Confirmation of the Plan and Procedures for Objection to Confirmation of the Plan, and (IV) Procedures and Deadline for Voting on the Plan;

3. This Disclosure Statement as approved by the Court;

4. The Plan;

5. A ballot; and

6. A pre-addressed return envelope.

Pursuant to the terms of the Plan, certain Classes of Claims are entitled to vote. Enclosed with this Disclosure Statement are a ballot and a pre-addressed envelope for return of the ballot. If you did not receive a ballot or if your ballot is lost or damaged, please contact Richard M. Lorenzen at Perkins Coie LLP, 2901 N. Central Avenue, Suite 2000, Phoenix, AZ 85012-2788, by telephone at (602) 351-8405, by fax at (602) 648-7000, or by email at RLorenzen@perkinscoie.com. CMB believes that confirmation of the Plan is in the best interests of CMB and its creditors, and that creditors should vote to approve the Plan. You may vote on the Plan by returning the enclosed ballot to the address shown below prior to the Voting Deadline, which is **5:00 p.m. local time in Phoenix, Arizona on May 12, 2011. Only Ballots received by the Voting Deadline can be counted for purposes of**

Plan confirmation.

**D.  The Disclosure Statement Approval**

The Bankruptcy Court will consider approval of this Disclosure Statement in accordance with section 1125(f) of the Bankruptcy Code and Bankruptcy Rule 3017 as containing "adequate information" to enable a hypothetical, reasonable investor typical of holders of Claims against CMB to make an informed judgment as to whether to accept or reject the Plan at the Confirmation Hearing.  All objections to the approval of this Disclosure Statement should be filed on or before **5:00 p.m. on May 12, 2011**.  Approval of this Disclosure Statement will not constitute a determination by the Bankruptcy Court as to the fairness or merits of the Plan.

**E.  Voting Procedure**

When deciding whether to vote for or against the Plan, creditors should carefully examine the Plan itself in addition to this Disclosure Statement.  The Plan will constitute the legally binding description of the rights held by the respective parties if the creditors approve the Plan and it is subsequently confirmed by the Bankruptcy Court.

To vote for or against the Plan, creditors entitled to vote must mark the enclosed ballot as directed and mail it in the enclosed envelope to Debtor's counsel as follows:

> Perkins Coie LLP
> Attention:  Richard M. Lorenzen
> 2901 N. Central Avenue, Suite 2000
> Phoenix, AZ 85012-2788
> Fax:  602-648-7000

**In order to be counted, ballots must be signed and received at the above address by 5:00 p.m. Arizona local time on May 12, 2011.  Ballots that are not signed will not be counted for purposes of determining whether the Plan has been accepted.  For more information on the voting and tabulation procedures, please refer to the Disclosure Statement Order.**

**F.    Confirmation of Plan**

The Bankruptcy Court may confirm the Plan if it is approved by creditors holding more than two-thirds in amount and one-half in number of the Claims voted in each impaired Class of Claims under the Plan.

**Objections, if any, to confirmation of the Plan must be filed with the Bankruptcy Court and a copy served on counsel to Debtor and counsel to Committee such that the objection is received on or before 5:00 p.m. on May 12, 2011.  A hearing to consider confirmation of the Plan will be held in the United States Bankruptcy Court for the District of Arizona, 230 N. First Avenue, Phoenix, AZ 85003, on May 19, 2011 at 10:00 a.m**.  The confirmation hearing may be adjourned from time to time without further notice except for the announcement of the adjourned date and time at the hearing on confirmation, or at any adjournment thereof.

## II.    DISCLAIMERS

THIS DISCLOSURE STATEMENT IS NOT THE PLAN.  THIS DISCLOSURE STATEMENT, TOGETHER WITH THE PLAN WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, SHOULD BE READ COMPLETELY.   FOR THE CONVENIENCE OF CREDITORS, THE PLAN IS SUMMARIZED IN THIS DISCLOSURE STATEMENT, BUT ALL SUMMARIES AND OTHER STATEMENTS REGARDING THE PLAN ARE QUALIFIED IN THEIR ENTIRETY BY THE PLAN ITSELF, WHICH IS CONTROLLING IN THE EVENT OF ANY INCONSISTENCY.  NO REPRESENTATIONS OR ASSURANCES CONCERNING DEBTOR, INCLUDING, WITHOUT LIMITATION, ITS OPERATIONS, THE VALUE OF ITS ASSETS, OR THE FUTURE OPERATIONS OF THE REORGANIZED DEBTOR, ARE AUTHORIZED BY DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  THIS IS A SOLICITATION BY DEBTOR ONLY.  THE REPRESENTATIONS MADE HEREIN ARE THOSE OF DEBTOR AND NOT OF ITS ATTORNEYS OR ANY OTHER PROFESSIONAL.  PORTIONS OF THIS DISCLOSURE STATEMENT DESCRIBING

DEBTOR'S FINANCIAL CONDITION HAVE NOT BEEN SUBJECTED TO AN INDEPENDENT AUDIT, BUT PREPARED FROM INFORMATION COMPILED BY DEBTOR FROM RECORDS MAINTAINED IN THE ORDINARY COURSE OF ITS OPERATIONS. REASONABLE EFFORTS HAVE BEEN MADE TO ACCURATELY PREPARE ALL FINANCIAL INFORMATION WHICH MAY BE CONTAINED IN THIS DISCLOSURE STATEMENT FROM THE INFORMATION AVAILABLE TO DEBTOR. HOWEVER, AS TO ALL SUCH FINANCIAL INFORMATION, DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ERROR.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN DEBTOR. CREDITORS AND INTEREST HOLDERS SHOULD CONSULT THEIR OWN LEGAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN ON THEM.

### III.    DEBTOR'S HISTORY AND BUSINESS BACKGROUND

**A.    History of CMB.**

CMB was formed in March, 2000, as a condition of obtaining a loan from KeyBank to complete certain work on a large office building located on the Properties now known as Parcel 7A and Parcel 7B. That loan retired all debt on property known as Lot 7 and provided additional funds. The members of CMB have, at all times, been CMB II and T-Bird, LLC, whose owners are Mr. Jerry Tokoph, Mr. Wayne Howard, and a pension plan for the benefit of Mr. and Mrs. Wayne Howard. As a condition of the loan, KeyBank required T-Bird and

CMB II to contribute their interests in the Property now known as Parcels 7A, 7B, and 7C to CMB. The contribution of these interests by the various entities resulted in the booking of certain "due-to" and certain "due-from" entries, solely for tax planning and reporting purposes.

In September, 2006, CMB obtained a loan from Union for the purpose of completing an extensive redevelopment of Lot 7. At that time it was decided that the large office building located on the property now known as Parcel 7A and 7B would be split into two buildings, and that Lot 7 would be subdivided and a Condominium Plat recorded to create what are now known as Parcels 7A, 7B, and 7C. Union required that a number of conditions be met in order to approve and fund the loan. Those conditions included, without limitation, the following:

- CMB would complete and record the Condominium Plat creating the three(3) parcels and obtain approval from the Maricopa County taxing authority to treat them as separate tax parcels.

- CMB would provide Union with a $3 million unconditional letter of credit (the "Letter of Credit") that would be held until the building construction and modifications were completed and fully paid for by CMB. The Letter of Credit was obtained from KeyBank by CMB, in exchange for CMB's deposit of $3 million in cash into a separate money market account at KeyBank (the "Letter of Credit Deposit"). The Letter of Credit was released by Union after CMB successfully completed the redevelopment construction, and the Letter of Credit Deposit was returned to CMB, which continued to hold the funds in an investment account at KeyBank, subject to CMB II and T-Bird's direction and consent, to use certain of those funds in connection with the Properties. The Letter of Credit Deposit, and the funds from KeyBank were never pledged to or subject to any security interest in favor of Union.

- CMB entered into a Renovation and Release Agreement with Union, pursuant to which, among other things, Parcel 7C was specifically excluded from Union's collateral.

## B. Business of Debtor.

CMB's business consists primarily of the ownership, development, and operation of Parcels 7A, 7B, and 7C, and activities associated therewith.

## C. Related Party Transactions and Appointment of Trustee.

Transactions involving insiders or other related parties that CMB deems material are summarized in this Section. As disclosed in its Statement of Financial Affairs in this case (DE 17), CMB transferred a total of $1,405,000.00 to its member, CMB II, in August, 2010. CMB contends that those funds constituted a distribution, consisting of the remaining funds from the Letter of Credit Deposit described in Section III(A) above, and/or other funds that belonged to CMB's members. CMB further contends that: (a) none of the funds distributed to CMB II constituted Union's collateral; (b) at the time of the transfers, Union had no right to such funds; (c) CMB had no liability to Union in connection with those funds; and (d) the distribution of any such funds was done in accordance with the terms of the Union Loan Documents.

Union has asserted, including in its *Motion for Appointment of a Trustee* ("Trustee Motion") in this case (DE 91) that these transfers were wrongful and/or fraudulent. Union has also asserted that CMB II is indebted to CMB III for approximately $1.3 million, based upon an entry in the 2009 tax return for CMB III, which reported a "due from" entry regarding CMB II in that amount. CMB and its members contend that this entry for tax purposes does not represent an actual account receivable or a debt that is collectible, or was ever intended to be repaid. Rather, the entry reflects an imbalance in certain prior distributions to CMB's members that were not made in accordance with the precise ownership percentages of the members, with the first such entry having been made over ten (10) years ago.

Union further contends that amounts paid by CMB to its manager, DFRI, prior to the bankruptcy, were excessive or improper for some reason, and that DFRI is obligated to repay those amounts to this bankruptcy estate. CMB doesn't understand or agree with this assertion. Amounts paid to DFRI were in accordance with the agreement between the parties, and approved by CMB's members. Moreover, such payments were not prohibited by or in violation of any of the terms of CMB's loan agreements with Union.

Because of the dispute between Union and CMB regarding these issues, the Court, on March 10, 2011 entered an order (DE 126) appointing a trustee for limited purposes in this case, to investigate, report on, and, to the extent appropriate, pursue any claims alleged by Union to exist against CMB's members or affiliates, as outlined above. Subsequently, the Court entered an order on March 16, 2011 (DE 136) appointing Maureen Gaughan as the trustee for limited purposes in this case. Thereafter, CMB has provided to the trustee all documents that she has requested, and, on March 30, 2011 CMB's representative and counsel met with the trustee and her counsel to discuss all of these issues. CMB is informed and believes that the trustee and her counsel are continuing to review the relevant documents and analyze these issues, and that this process, including potential future discussions, will continue.

## IV.    THE BANKRUPTCY CASE

### A.    Events Leading to Bankruptcy.

Due to the recession and economic collapse that began in or around 2008, CMB lost certain tenants who had been renting space in the buildings located on Parcel 7A and Parcel 7B. As a result, the rental cash flow from those buildings was reduced to a point that CMB was unable to cover all operating expenses and the required debt service payments to Union from those funds. CMB attempted for over a year prior to the filing of its bankruptcy petition to engage Union in discussions and/or negotiations regarding a potential restructuring of the Union indebtedness in a reasonable manner, taking into account the changed economic circumstances. CMB attempted to initiate these discussions

independently, and, during the months prior to the filing of its bankruptcy petition, through legal counsel. All of CMB's efforts to initiate such a dialogue with Union were unsuccessful. Union refused to meet or to participate in a discussion regarding potential restructuring or alternatives, and refused to respond to specific restructuring proposals submitted by CMB.

Ultimately, after approximately one and a half years with no movement or assistance by Union, CMB withheld the monthly debt service payments to Union in August and September, 2010. Union responded by declaring a default in September, 2010, accelerating all debt, attempting to assess a $3 million penalty, and by filing a lawsuit seeking the appointment of a receiver for CMB's business in Maricopa County Superior Court. In order to maintain its business operations and reorganize its debts in accordance with the Bankruptcy Code, CMB filed its bankruptcy petition on September 23, 2010, prior to the hearing on Union's request for appointment of a receiver.

**B.      Official Committee of Unsecured Creditors.**

The Bankruptcy Code provides for the appointment of an official committee of unsecured creditors in a Chapter 11 case to promote the interests of all unsecured creditors. This committee is generally chosen from the 20 largest unsecured creditors and is appointed by the United States trustee. In this Bankruptcy Case, no committee was formed.

**C.      Funding for Postpetition Obligations.**

Since the commencement of this Bankruptcy Case, CMB has timely paid or performed all of its obligations incurred after the Petition Date. Its cash has come from two principal sources: (1) contributions from its members; and (2) cash collateral of its lender, Union, to the extent permitted under the order entered on December 17, 2010 [DE 64], and subsequent agreements.

**D.      Postpetition Operations.**

**1.      Cash Collateral**

Since the filing of its bankruptcy petition, CMB has consistently generated and

collected revenues in excess of its operating expenses, thereby increasing the amount of Union's cash collateral, protecting Union's position, while continuing to maintain first class management and operation of the buildings. The current monthly gross rentals from tenants at 7A and 7B is approximately $260,000.00.

### 2. Management

The Debtor has, at all times, been managed by DFRI. DFRI has substantial experience in the management of commercial properties. DFRI is owned by Mr. Jerry Tokoph, one of the indirect owners of CMB. DFRI's management fees during the case have been substantially reduced from the amounts to which it is otherwise entitled.

### E. Other Important Developments.

Since the commencement of this Bankruptcy Case, CMB has improved its business operations, and effectuated its business reorganization and financial restructuring so that CMB can emerge from this bankruptcy case as a viable business. A number of case benchmarks are described below.

### 1. Union Opposes CMB's Use of Cash Collateral.

On September 24, 2010, the first day following the filing of CMB's bankruptcy petition, Union filed a motion asking the Court to prohibit CMB from using any of the rental proceeds from Parcels 7A and 7B for payment of any operating or other expenses in connection therewith [DE 8]. On October 8, 2010, CMB filed its motion seeking authority to use those rental proceeds for the reasonable and necessary expenses associated with the Properties, together with a motion to accelerate the setting of a hearing on that motion [DE 26 and 27, respectively]. At a hearing on October 19, 2010, the Court authorized CMB to use rental proceeds for payment of certain expenses, and, at a subsequent hearing on October 29, 2010, the Court granted further authority for CMB's use of those funds to pay the reasonable and necessary operating expenses. Since that time, Union has asserted that certain payments previously approved for CMB's consultant, Ray Van Cleave, were inappropriate and must be terminated in the future and returned as to prior payments. In

addition, Union has opposed the use of any of the rental proceeds for payment of certain expenses that are necessary in order to obtain a valuable five year extension of a lease of one of CMB's major tenants.

### 2. Union's Single Asset Debtor Motion.

On September 30, 2010, Union filed a motion seeking a determination that CMB is a single asset real estate debtor under 11 U.S.C. § 101(51B) [DE 13]. Under the Bankruptcy Code, the granting such a motion may have had the effect of accelerating the date by which CMB was required to file a plan of reorganization in this case. At a hearing on January 7, 2011, the Court determined that CMB is a single asset real estate debtor, thereby resulting in a situation in which Union could be entitled to relief from the automatic stay to permit it to foreclose on Parcels 7A and 7B if a plan of reorganization was not filed in this case by February 7, 2011. The Plan and this Disclosure Statement will have been filed on or before February 7, 2011, thereby preserving CMB's ability to reorganize, and continuing to prevent Union from foreclosing pending the outcome of CMB's efforts.

### 3. Union's Motion to Dismiss.

On October 18, 2010, Union filed its objection to CMB's request for use of cash collateral, coupled with a motion to dismiss CMB's bankruptcy case [DE 33]. Union asserted, in connection with that motion, that its collateral position was being jeopardized, in part, because of the expiration in March, 2011, of certain leases at the Properties. At the court hearing on January 7, 2011, the Court deferred further argument or hearings on this motion pending a review of CMB's Plan.

### 4. Union's Motion for Relief From the Automatic Stay.

On November 30, 2010, Union filed its *Motion for Relief From the Automatic Stay*, seeking entry of an order that would permit it to foreclose its deed of trust against Parcels 7A and 7B [DE 57]. At the January 7, 2011 court hearing, the Court deferred further arguments and hearings on this motion pending a review of CMB's Plan.

### 5. CMB's Efforts to Extend Expiring Leases.

Throughout this case, CMB has worked diligently in an attempt to negotiate extensions of leases with tenants that are scheduled to expire in March, 2011. One of those leases is with Kaplan Higher Education Corporation, a Delaware corporation, d/b/a LONG MEDICAL INSTITUTE ("Kaplan") On December 21, 2010, at the Bankruptcy Rule 2004 examination of Mr. Jerry Tokoph, Union's counsel was advised that a lease extension had been negotiated with Kaplan, informed of the general terms of the extension, and that one of the conditions of such lease extension was that Union agree to execute a standard subordination and non-disturbance agreement ("SNDA") to provide Kaplan with appropriate assurances that its extended lease would be honored by Union if Union was successful in its ongoing efforts to foreclose its lien against that building. A copy of a proposed SNDA was provided to Union's counsel at that time. Despite various followup requests to Union regarding the SNDA, no response of any kind was received. At the January 7, 2011 court hearing in this case, Union's counsel advised CMB and the Court for the first time that the only reason for the lack of a response was that Union had not seen the terms of the proposed Kaplan lease extension.

On January 12, 2011, a copy of the proposed lease extension with Kaplan was provided to Union, together with a request for authority to use cash collateral for payment of real estate commissions, roof repairs (approximately $77,000.00), and HVAC upgrades (approximately $25,000.00), to secure a five (5) year lease extension that would recoup those expenses in less than four months. Despite several followup requests for Union's response to these issues, no response of any kind was forthcoming. Accordingly, on January 27, 2011, CMB filed its *Emergency Motion to Approve Use of Cash Collateral* for payment of those amounts. Subsequently, Union has advised CMB that it will not consent to the payment of these amounts, thereby jeopardizing the Kaplan lease extension. Union also opposed any use of its cash collateral for these purposes unless a Chapter 11 trustee was appointed. The Court approved the use of cash collateral for these purposes on March 14, 2011 (DE 127).

**F.      Settlement Efforts.**

Throughout the case, CMB has continued to attempt to engage Union in a discussion or negotiation concerning a potential restructuring of its loan. CMB's efforts have included attempts to arrange a settlement meeting or telephone conference. All of those efforts have been unsuccessful, and Union has refused to engage in any such discussions or negotiations. On January 24, 2011, CMB also tendered a written offer to Union containing a proposal for settlement of the Union claims and a resolution of this bankruptcy case. The settlement offer expired according to its terms on January 31, 2011. No response to that offer or any counterproposal was ever received from Union.

## V.      ASSETS AND LIABILITIES

**A.      Assets.**

CMB's assets are comprised primarily of Parcels 7A, 7B, 7C, and related personal property.

**B.      Liabilities.**

**1.      Secured Claims.**

CMB is indebted to creditors whose claims are secured, in whole or in part, by CMB's property. Under the Plan, these claims have been placed in 2 classes. These secured claims are summarized below. The categories of secured claims discussed below are for convenience and do not track the classes of claims set forth in the Plan.

**a.      Lenders' Claims**. CMB is indebted to two different lenders for borrowed money. Each lender holds one or more trust deed liens on certain of CMB's real estate inventory. These lenders are:

(i)      <u>Union</u>.

(ii)      <u>Harvey</u>.

**b.      Property Tax Claims**. CMB's real estate is subject to potential statutory liens that secure claims of governmental units for property taxes, assessments, and similar impositions. As of the date hereof there are no past due property taxes or

assessments.

### 2. Administrative Expense Claims.

Administrative Expense Claims consist primarily of (a) costs and expenses incurred in connection with the operation of CMB's business after the Petition Date, (b) claims of professionals who are or were employed at the expense of CMB's bankruptcy estate, to the extent allowed by the Court, and (c) fees and charges assessed against the bankruptcy estate under 28 U.S.C. § 1930, including quarterly fees payable to the United States trustee. Assuming the Effective Date of the Plan is on or around May 1, 2011, CMB projects that unpaid Administrative Expense Claims will total approximately $100,000.00.

### 3. Priority Claims.

CMB estimates that there are no unpaid claims that arose before the Petition Date that are entitled to priority under section 507(a) of the Bankruptcy Code.

### 4. Unsecured Claims.

In addition to those claims described above, a variety of other claims that are not entitled to priority under the Bankruptcy Code have been asserted against CMB in this case. The categories of unsecured claims discussed below are for convenience and do not track the classes of unsecured claims set forth in the Plan.

**a. Lender's Claims**. The largest unsecured claim consists of Union's Deficiency Claim in Class 6. All other general unsecured claims will be treated in Class 5.

## VI. DESCRIPTION OF THE PLAN

A discussion of the principal provisions of the Plan is set forth below. The discussion of the Plan which follows is a summary only and is qualified in its entirety by reference to the full text of the Plan itself. You are urged to read the Plan in full and make a thorough review of its terms in evaluating whether to accept or reject the Plan. If any inconsistency exists between the summary herein and the Plan, the terms of the Plan control.

**A.     Classification and Treatment of Claims and Equity Interests.**

### 1.     Classification Generally.

The Plan designates Classes of Claims and Equity Interests for purposes of voting on the Plan and making distributions.  All Claims, other than Administrative Expense Claims and Priority Tax Claims, and all Equity Interests are placed in Classes under the Plan.  A Claim is classified in a particular Class only to the extent that the Claim falls within the description of that Class and is classified in one or more other Classes to the extent that any remainder of the Claim falls within the description of such other Classes.

### 2.     Unclassified Claims

#### a.     Administrative Claims

Administrative Claims are claims incurred by CMB during the Bankruptcy Case. Each Administrative Claim other than Fee Claims accrued on or before, but unpaid as of, the Effective Date will be paid in full in Cash on the latest of:  (i) the Effective Date; (ii) the date on which the Bankruptcy Court enters an order allowing such Administrative Claim; or (iii) the date on which CMB or Reorganized Debtor, as the case may be, and the holder of such Allowed Administrative Claim otherwise agree in writing; provided, however, that Administrative Claims representing indebtedness or other obligations incurred in the ordinary course of business of CMB will be paid in the ordinary course of business and in accordance with any terms and conditions of any agreement or order relating thereto.  CMB does not believe that there are any holders of Administrative Claims that are not either Fee Claims or incurred in the ordinary course.

#### b.     Professional Fees

Each professional person, whose retention or appointment in the Bankruptcy Case has been approved by the Bankruptcy Court, including counsel retained by CMB, CMB's accountants and other advisors, as well as the attorneys and financial advisors retained by the Committee, has a Fee Claim against the estate.  Each professional shall file with the Bankruptcy Court and serve on all parties required to receive notice a final fee application

within 45 days after the Effective Date. The failure to timely file the fee application as required under the Plan will result in the Fee Claim being forever barred and discharged. All Allowed Fee Claims shall be paid by the Reorganized Debtor from Cash from operations or through application of any retainer held by such professional person.

### c.    Priority Tax Claims

Each holder of an Allowed Priority Tax Claim will be paid the full amount of its Allowed Priority Tax Claim on the Effective Date.

### 3.    Classified Claims.

A creditor will receive a distribution under the Plan only if such creditor is the holder of an Allowed Claim. Distributions under the Plan are in full satisfaction of all Claims against CMB. The Plan provides for classification and treatment of all Claims against the estate as follows:

### a.    Class 1.  Priority Claims

Class 1 is unimpaired. On the latest of: (i) the Effective Date; (ii) ten days after the date a Priority Claim becomes an Allowed Claim; and (iii) the date on which CMB or the Reorganized Debtor, as the case may be, and the holder of such Allowed Priority Claim otherwise agree in writing, each holder of an Allowed Priority Claim will be entitled to receive Cash in an amount sufficient to render the Allowed Priority Claim unimpaired under section 1124 of the Bankruptcy Code, in full settlement, release and discharge of such Allowed Priority Claim.

### b.    Class 2.  Union Secured Claim

Class 2 is impaired by the Plan and Union is entitled to vote on the Plan. Union shall receive the treatment described below and more fully in the Plan.

(i)    On the Effective Date, the Reorganized Debtor shall execute and deliver to Union the Union Note and the other Amended Union Loan Documents. The Union Note shall be in a principal amount equal to $9,700,000.00, or such other amount as may be established as the Union Secured Claim. The proposed valuation of the Union Secured

Claim is based upon an appraisal for the properties of $9,250,000, using the income valuation approach, plus an estimate of $450,000 in cash collateral as of the Confirmation Date. Interest shall accrue on the principal balance of the Union Note at the Union Interest Rate from the Effective Date until the principal balance is paid in full.

(ii)     The Reorganized Debtor shall make payments to Union in accordance with the terms of the Plan and Union's Secured Claim shall be paid in full on or before the eleventh (11th) anniversary of the Effective Date.

(iii)     The Union Note shall be secured by a first priority trust deed lien on Parcels 7A, 7B, and rents associated therewith. In each case the claims are subject and subordinate only to Claims of governmental units for ad valorem property taxes and similar impositions, if any, that are secured by liens on such property and that have priority over the liens of Union.

### c.     Class 3.  Harvey Secured Claim

Class 3 is impaired by the Plan and Harvey is entitled to vote on the Plan. Harvey shall receive the treatment described in the Plan. Harvey shall retain its first priority trust deed lien on Parcel 7C. The claim is subject and subordinate only to Claims of governmental units for ad valorem property taxes and similar impositions, if any, that are secured by liens on such property and that have priority over the liens of Harvey.

### d.     Class 4.  Property Tax Lien Claims

Class 4 is unimpaired and the holders of Class 4 Claims are entitled to vote on the Plan. The Reorganized Debtor shall pay to each holder of an Allowed Class 4 Claim, in Cash on the Effective Date from the appropriate Segregated DIP Account. Real Property Tax claims on real property to be transferred by CMB to one or more of its lenders shall attach to the property to be transferred and be paid on the ultimate disposition of that property.

### e. Class 5. Unsecured Claims Other Than Union Deficiency Claim

Each holder of an Unsecured Claim in Class 5 will receive a distribution of 80% of its Allowed Claim on the Effective Date.

### f. Class 6. Union Deficiency Claim

Class 6 is impaired by this Plan and Union is entitled to vote on this Plan. Union shall receive a distribution of $1,000,000.00 on the Effective Date in satisfaction of the Union Deficiency Claim.

### g. Class 7. Existing Interests

Class 7 is impaired by the Plan and the holders of the Interests of CMB shall be deemed to reject the Plan. However, CMB II will purchase the equity interests in the Reorganized Debtor, by the contribution of cash to the Reorganized Debtor, on the Effective Date, of not less than $4,500,000.00 (i.e., the New Value). The New Value will be used to:

    (a)    pay the amount necessary to pay all Class 1 and Class 4 Allowed Priority Claims as set forth above;

    (b)    establish the reserve account to fund, among other things, (1) tenant improvements, (2) broker's commissions, and (3) other necessary and appropriate capital expenses of the Real Property to ensure that the value of the Properties is maintained; and

    (c)    pay 80% of Class 5 Unsecured Claims, and $1,000,000.00 to Class 6.

If the Court determines that, under the circumstances, the New Value to be contributed by CMB II is insufficient, or that other parties-in-interest should be allowed to bid for the equity interests in the Reorganized Debtor, then other interested parties may bid for the equity interests in the Reorganized Debtor by meeting all of the terms and conditions identified below. Such bids shall be made pursuant to the following auction procedures and terms:

(a)     The auction of the equity interests in the Reorganized Debtor will be held at the time of the Confirmation Hearing in the courtroom, with the Court presiding over the bidding.

(b)     Any party wishing to bid on the equity interests of the Reorganized Debtor must satisfy the following requirements to be a "Qualified Bidder":

    i.     The bidder must be a current Creditor or Interest Holder of the Debtor. This requirement is necessary to avoid any potential registration or like requirements of any applicable securities laws or regulations.

    ii.     The bidder must deposit $1,000,000.00 in cash ("Deposit") with the Debtor's counsel at least twenty-five days prior to the Confirmation Hearing. Any Deposits will be returned to any unsuccessful bidder on the day following the Confirmation Hearing. The Deposit, plus any additional amounts bid by the Successful Bidder at the auction for the equity interests in the Reorganized Debtor, will be delivered to the Reorganized Debtor on the Effective Date of the Plan.

    iii.     At least twenty-five days prior to the Confirmation Hearing, all bidders must provide satisfactory evidence to the Debtor of their ability to make a cash payment to the Debtor, on the Effective Date of the Plan, in the amount of no less than the Equity Contribution.  To the extent that the Debtor contests the sufficiency of the evidence submitted regarding a bidder's ability to pay such amount, the evidence will be presented to the Court at the Confirmation Hearing, prior to bidding, and the Court will make a determination as to the sufficiency of the evidence and whether the bidder should be deemed to be a Qualified Bidder.

    iv.     At least twenty-five days prior to the Confirmation Hearing, all bidders must provide satisfactory evidence to the Debtor of their ability to operate the Reorganized Debtor in such a manner as to satisfy the

requirements of this Plan, including payments to administrative claimants, secured creditors and unsecured creditors, on the terms and conditions set forth herein. To the extent that the Debtor contests the sufficiency of the evidence submitted regarding a bidder's ability to make payments as required by the Plan, the evidence will be presented to the Court at the Confirmation Hearing, prior to bidding, and the Court will make a determination as to the sufficiency of the evidence and whether the bidder should be deemed to be a Qualified Bidder.

v.     At least twenty-five days prior to the Confirmation Hearing, all bidders must provide satisfactory evidence to the Debtor that they are authorized to do business in the state of Arizona, and have, or have the ability to obtain, any and all necessary permits and/or licenses to operate the Properties. To the extent that the Debtor contests the sufficiency of such evidence, the evidence will be presented to the Court at the Confirmation Hearing, prior to bidding, and the Court will make a determination as to the sufficiency of the evidence and whether the bidder should be deemed to be a Qualified Bidder.

(c)     All bids for the interests in the Reorganized Debtor shall be in increments of no less than $250,000.00.

(d)     In order for a Qualified Bidder's bid to be determined to be higher and better than the New Value to be contributed by CMB II as set forth above, the Qualified Bidder's bid must:

i.     Exceed, by at least $250,000.00, CMB II's bid; and

ii.     Provide that the Qualified Bidder will comply with and perform under the terms of this Plan, including all payments to creditors (including tenant security deposits to tenants), and enter into and consummate

any New Leases then existing, including payment of all tenant improvements and other amounts provided for thereunder, and as provided herein.

(e)     CMB shall have the right and ability to bid at the auction. Competing bids will be assessed by the Court for their relative merits including, but not limited to, the amount of the bid and the expertise of the would-be New Interest Holder to manage and guide the Reorganized Debtor after the Effective Date and to satisfy the requirements of this Plan, including its ability to make the payments to creditors required herein and to satisfy the assumed obligations as required herein.

On the Effective Date, if CMB is not the successful bidder at the auction, then the Successful Bidder at the auction must deliver its cash bid to the Reorganized Debtor and, upon such delivery, the Successful Bidder will be deemed to hold the equity interests in the Reorganized Debtor, subject to all terms and conditions of this Plan, including the obligations to other creditors existing and prospective tenants as provided herein and the assumption of liabilities as provided herein.

**B.     Plan Funding.**

The Plan will be funded by a combination of CMB's Cash on hand as of the Effective Date, the Equity Contribution, and Cash that is collected or generated by the Reorganized Debtor after the Effective Date.

**C.     Distributions to Creditors.**

The provisions of the Plan that govern distributions to creditors and the resolution of disputed and contingent claims are set forth in Article 8 of the Plan. Certain of those provisions are summarized below.

**1.     Distributions Generally.**

Distributions under the Plan will be made on the Effective Date and on each Distribution Date, or, in each case, as soon thereafter as is practicable, as more specifically set forth in the Plan. Distributions to be made by the Reorganized Debtor under the Plan ordinarily will be made by check drawn on a domestic bank. Withholding taxes and other

amounts required to be withheld under applicable law will be deducted from distributions. Distributions to creditors pursuant to the Plan ordinarily will be delivered by regular mail, postage prepaid, in an envelope addressed as directed in a request served on the Reorganized Debtor as provided in the Plan, but if no such request is made, at the address shown in CMB's schedules, as they may from time to time be amended, or, if a different address is stated in a proof of claim duly filed with the Court, to such address.

### 2. Undeliverable or Unclaimed Distributions.

For a period of 180 days after any particular distribution is made pursuant to the Plan, distributions that are unclaimed, including (a) checks that have been returned as undeliverable without a proper forwarding address and (b) checks that were not mailed or delivered because of the absence of a proper address to which to mail or deliver the same, shall be distributed to the holders of Allowed Claims entitled thereto upon presentment to the Reorganized Debtor of satisfactory proof of entitlement. The Reorganized Debtor shall make a reasonable effort to ascertain the correct mailing address from information generally available to the public for each holder of an Allowed Claim whose check or other property cannot be mailed or delivered because of the absence of a proper address or whose check has been returned without a proper forwarding address. On the first day after the expiration of such 180 day period (i) holders of Allowed Claims previously entitled to such undeliverable or unclaimed distribution shall no longer be entitled to such distribution and (ii) such Claims shall be deemed disallowed for all purposes, including any future distributions. All disbursements made under the Plan that remain unclaimed shall become property of the Reorganized Debtor.

### 3. Time Bar for Cashing Distribution Checks.

The Reorganized Debtor may (but shall not be obligated to) stop payment on any check issued by it in respect of Allowed Claims if such check is not negotiated within 60 days after the date of issuance thereof. Request for reissuance of any check shall be made to the Reorganized Debtor in accordance with the Plan, by the holder of the Allowed Claim to

whom such check originally was issued, prior to the expiration of the 180 day period set forth in the Plan. After such date, the holder of any such Claim who has failed to make a timely request for reissuance of such a voided check shall not be entitled to any other or further distribution under the Plan on account of such voided check or such Claim.

### 4. Limitations on Amending Claims.

Except as otherwise provided in the Plan, after the Confirmation Date, a proof of claim may be amended by the holder of such Claim solely to decrease, but not to increase, the amount of such Claim.

## D. Executory Contracts and Unexpired Leases.

On the Effective Date, all executory contracts and unexpired leases of CMB not previously rejected and not the subject of a pending motion to reject will be assumed by the Reorganized Debtor, in each case, in accordance with the provisions and requirements of sections 365 and 1123(b)(2) of the Bankruptcy Code. Any monetary amounts that are in default under a contract or a lease that is assumed pursuant to the Plan will be satisfied by a cash payment unless otherwise agreed.

## VII. THE REORGANIZED DEBTOR

## A. Ownership and Management.

### 1. Interest Holders.

The Plan provides that on the Effective Date the equity interests in the Debtor will be sold to existing members, or another party.

### 2. Management.

The Plan provides that upon the occurrence of the Effective Date, existing management will remain in place. CMB is currently managed by DFRI.

## B. Financial Projections.

CMB has prepared financial projections for the Reorganized Debtor based on the treatment of CMB's various claims under the Plan. Attached hereto as <u>Exhibit A</u> are projected cash flow statements and assumptions for the Reorganized Debtor as of and for the

eleven fiscal yearly periods beginning 2011 and ending 2021. These projections are based on a number of assumptions. The major assumptions for these projections are included as part of Exhibit A. The Reorganized Debtor's business plan contemplates certain New Leases during the life of the Plan. As to these New Leases, it is assumed that the cost of these new projects will be funded out of corporate cash flow and the Equity Contribution. CMB believes that the major assumptions on which these financial projections are based are reasonable and that the projected results are reasonably achievable by the Reorganized Debtor's management team. However, as is the case with all "forward looking" statements, no assurance can be given that the Reorganized Debtor will be able to achieve the projected results. A discussion of the risks attendant to the Reorganized Debtor's performance of its business plan is contained in Section XI. below.

## VIII.  VOTING ON THE PLAN

### A.     Voting Eligibility.

In general, a holder of a claim or interest may vote to accept or reject a plan if both (1) the claim or interest is "allowed," which means generally that it is not disputed, contingent or unliquidated in amount, and (2) the claim or interest is part of a class that is impaired by the plan. If a creditor or equity interest holder will not receive any distribution under a plan in respect of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan and provides that the holder is not entitled to vote. On the other hand, if the claim or interest is part of a class that is not impaired, the Bankruptcy Code conclusively presumes that holder of such claim or interest has accepted the plan and provides that the holder is not entitled to vote. Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (1) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof, or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan (a) cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy), (b) reinstates the maturity of such claim or interest as it existed before

the default, (c) compensates the holder of such claim or interest for any damages resulting from such holder's reasonable reliance on such legal right to an accelerated payment, and (d) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest. Under the Plan, only the holders of allowed claims (or of disputed claims that are temporarily allowed by the Court for voting purposes) in Classes 2, 3, and 5 are entitled to vote. All other Classes of claims are either not impaired under the Plan and are deemed to have accepted the Plan without voting, or are deemed to have rejected the Plan.

**B.** **Voting Deadline.**

The deadline for submitting completed ballots is 5:00 p.m. (prevailing Arizona Time) on May 12, 2011 (the "Voting Deadline"). Only those ballots that are actually received by the Voting Deadline will be counted as either accepting or rejecting the Plan.

**C.** **Acceptance By a Class.**

As a condition to confirmation, the Bankruptcy Code requires, among other things, that (1) at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider, and (2) except under certain circumstances, each class of claims or interests that is impaired under the plan accepts the plan. Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only the votes of those creditors who actually vote to accept or reject the plan.

Additionally, if creditors in a Class fail to (i) vote to either accept or reject the Plan and (ii) object to the Plan, such Class shall be deemed to accept the Plan.

**D.** **Voting Procedures.**

**1.** **Submission of Ballots.**

A form of ballot is included among the materials that accompany this Disclosure Statement. All votes to accept or reject the Plan must be cast by properly submitting a duly

completed and executed ballot. Ballots must be delivered to Debtor's counsel as designated in the ballot at the address or fax number set forth on the ballot form and must be received by the Voting Deadline. The method of delivery of a ballot is at the election and risk of the voting creditor. Please carefully follow the directions contained on the enclosed ballot.

### 2. Incomplete Ballots.

Any ballot received which is not signed, which does not contain sufficient information to permit the identification of the claimant, or which does not indicate either an acceptance or rejection of the Plan or which indicates both acceptance and rejection of the Plan will be invalid and will not be counted as a vote cast with respect to the Plan.

### 3. Withdrawal or Change of Votes.

A ballot may be withdrawn by delivering a written notice of withdrawal to Debtor's counsel at any time prior to the Voting Deadline. Thereafter, a withdrawn ballot will not be effective unless approved by the Bankruptcy Court. In order to be valid, a notice of withdrawal must (i) specify the name of the holder who submitted the vote on the Plan to be withdrawn, (ii) contain a description of the Claim to which it relates and (iii) be signed by the holder in the same manner as on the ballot. CMB expressively reserves the absolute right to contest the validity of any such withdrawals of votes on the Plan. Any creditor who has submitted to Debtor's counsel a properly completed ballot prior to the Voting Deadline may change such vote by submitting to Debtor's counsel prior to the Voting Deadline a subsequent properly completed ballot. In the case where more than one timely, properly completed ballot is received with respect to the same Claim, the ballot that bears the latest date will be counted.

### 4. Voting Multiple Claims.

Only one form of ballot is provided for voting. Any creditor that holds a Claim in more than one Class or multiple Claims within a Class is required to vote separately with respect to each Claim. Please sign, and return in accordance with the instructions on the ballot form, a separate ballot with respect to each such Claim.

# IX.    CONFIRMATION OF THE PLAN

## A.    Confirmation Hearing.

The Bankruptcy Court will hold a hearing to consider confirmation of the Plan commencing on May 19, 2011, at 10:00 a.m. (prevailing Arizona Time) in the United States Bankruptcy Court for the District of Arizona, 230 N. First Avenue, Phoenix, Arizona 85003. The confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date and time made at the confirmation hearing.

## B.    Deadline for Objecting to Confirmation.

Any objection to confirmation of the Plan must be in writing, must state with specificity the grounds for any such objections, and must be filed with the Bankruptcy Court on or before May 12, 2011.

## C.    Requirements for Confirmation.

### 1.    Confirmation Requirements Generally.

The Bankruptcy Court can confirm the Plan only if all the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation are that (i) the plan be accepted by all impaired classes of claims and of interests or, if rejected by an impaired class, the plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) the plan is feasible, and (iii) the plan is in the "best interest" of creditors and stockholders that are impaired under the plan.

### 2.    Feasibility.

In connection with confirmation with the Plan, the Bankruptcy Court will have to determine that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Reorganized Debtor unless such liquidation or reorganization is proposed in the Plan. CMB believes that the Reorganized Debtor will be able to perform its obligations under the Plan. See Section VII above.

### 3. Best Interests of Creditors.

Section 1129(a)(7) of the Bankruptcy Code requires that any holder of a claim or interest in an impaired class that votes against a proposed plan must receive under the plan distributions that have a value, as of the effective date of the plan, at least equal to that which the holder would receive if the debtor's assets were liquidated under Chapter 7 of the Bankruptcy Code. To determine what creditors and Interest holders would receive if CMB were liquidated, the Bankruptcy Court must determine the dollar amount that would be generated from a liquidation of its assets in the context of a hypothetical liquidation. Such determination must take into account the fact that, as to each asset, all claims secured by that asset would have to be paid in full, as would all administrative expenses in the Chapter 7 case and in the original Bankruptcy Case, before the balance of those proceeds would be made available to pay unsecured creditors and Interest holders. To determine if a plan is in the best interest of each impaired class, the present value of the distributions from the proceeds of the hypothetical liquidation of the assets (after subtracting the amount attributable to secured claims and administrative expenses of the bankruptcy case) must be compared with the present value of the consideration offered to each such class under the plan. In addition, the rule of absolute priority of distribution from a debtor's estate must be applied. Under that rule, no junior holder of a claim or equity interest may receive distributions under a plan unless the plan provides that all senior classes will be paid in full or unless all senior classes vote to accept the plan. After consideration of the effect that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to CMB's creditors and Interest holders (including (i) the increased cost and expense of liquidation under Chapter 7 arising from fees payable to a Chapter 7 trustee and the attorneys and other professional advisors to such trustee, (ii) the time value of money resulting from what is likely a more protracted proceeding, and (iii) the application of the rule of absolute priority to distributions in a Chapter 7 case), CMB has determined that confirmation of the Plan will provide each creditor in an impaired Class with a greater recovery than such

creditor would receive in a Chapter 7 case concerning CMB.

CMB estimates that in a liquidation case under Chapter 7, general unsecured creditors would receive cash distributions totaling approximately $720,546.00. It is also estimated that in a Chapter 7 case, general unsecured creditors would realize on their claims a total recovery in the approximate amount of 6.79%. The actual recovery, as a percentage of allowed claims, would depend largely on the size of the pool of the general unsecured claims after the lenders' unsecured deficiency claims are determined and after all disputed claims are finally resolved. A liquidation analysis is attached hereto as <u>Exhibit B</u>. This Liquidation is based upon a discounted, liquidation valuation for Parcels 7A and 7B, and an appraisal of the liquidation value of Parcel 7C. All unsecured creditors will recover more under the Plan than they would in a Chapter 7 case. The recovery on any particular general unsecured claim, as a percentage of the claim, will depend on how that claim is classified in the Plan.

**D.     Confirmation Over Dissenting Class.**

The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all impaired classes, as long as (a) the plan otherwise satisfies the requirements for confirmation, (b) at least one impaired class of claims has accepted it without taking into consideration the votes of any insiders in such class, and (c) the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan. These so-called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.

**1.     Fair and Equitable.**

The Bankruptcy Code establishes different "cramdown" tests for determining whether a plan is "fair and equitable" to dissenting impaired classes of secured creditors, unsecured creditors, and equity interest holders as follows:

**a.     Secured Creditors.**

A plan is fair and equitable to a class of secured claims that rejects the plan if the plan provides: (a) that each of the holders of the secured claims included in the rejecting class (i)

retains the liens securing its claim to the extent of the allowed amount of such claim, whether the property subject to those liens is retained by the debtor or transferred to another entity, and (ii) receives on account of its secured claim deferred cash payments having a present value, as of the effective date of the plan, at least equal to such holder's interest in the estate's interest in such property; (b) that each of the holders of the secured claims included in the rejecting class realizes the "indubitable equivalent" of its allowed secured claim; or (c) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of such liens with such liens to attach to the proceeds of sale, and the treatment of such liens on proceeds in accordance with clause (a) or (b) of this paragraph.

### b. Unsecured Creditors.

A plan is fair and equitable as to a class of unsecured claims that rejects the plan if the plan provides that: (a) each holder of a claim included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan, equal to the amount of its allowed claim; or (b) the holders of claims and interests that are junior to the claims of the rejecting class will not receive or retain any property under the plan.

### c. Holders of Equity Interests.

A plan is fair and equitable as to a class of equity interests that rejects the plan if the plan provides that: (a) each holder of an equity interest included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of (i) any fixed liquidation preference to which such holder is entitled, (ii) the fixed redemption price to which such holder is entitled, or (iii) the value of the interest; or (b) the holder of any interest that is junior to the interests of the rejecting class will not receive or retain any property under the plan.

CMB believes that the Plan and the treatment of all impaired Classes under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

### 2. Unfair Discrimination.

A plan of reorganization does not "discriminate unfairly" if a dissenting class is treated substantially equally with respect to other classes similarly situated and no class receives more than it is legally entitled to receive for its claims or interests. CMB believes that the Plan does not discriminate unfairly against any impaired Class.

### E. Effects of Confirmation.

### 1. Vesting of Estate Property.

As of the Effective Date, the Reorganized Debtor shall be revested with title to all property of its estate, free and clear of all liens, Claims and interests, except to the extent provided in the Plan or in the Confirmation Order. As of the Effective Date, the Reorganized Debtor may use and dispose and otherwise deal with such property and may conduct it affairs, in each case, without supervision of the Bankruptcy Court and free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

### 2. Discharge.

Except, as otherwise provided in the Plan or in the Confirmation Order, on the Effective Date, pursuant to section 1141(d) of the Bankruptcy Code, CMB and the Reorganized Debtor shall be discharged from all liability on any and all Claims against CMB that arose at any time before the Effective Date.

### 3. Exculpation.

Section 11.7 of the Plan provides:

> Neither Debtor nor the Committee, nor any of their respective officers, directors, members, representatives or agents who served as such during this Bankruptcy Case, shall have or incur any liability to any Entity for any act or omission in connection with or arising out of the negotiation of the Plan, the pursuit of confirmation of the Plan, the pursuit of approval of the Disclosure Statement, the consummation of the Plan, the transactions contemplated and effectuated by the Plan, the administration of the Plan or any other act or omission during the administration of the Bankruptcy Case or Debtor's Estate. Notwithstanding the foregoing, Claims arising from gross negligence or willful misconduct on behalf of Debtor are not

waived or released in any manner by the Plan.  In all respects,
Debtor will be entitled to rely upon the advice of counsel with
respect to its duties and responsibilities under the Plan.

**4.      Effect on Insurance Policies.**

Section 11.8 of the Plan addresses insurance policies issued to CMB and the various
agreements related to such policies.

## X.      ALTERNATIVES TO THE PLAN

CMB believes that the Plan affords its creditors the greatest opportunity for
realization on its assets and the greatest possible value that could be realized on their claims.
CMB also believes that the Plan is fair and reasonable in its treatment of all constituencies.
Possible alternatives to the Plan which might arise if the Plan is rejected or if the Court
refuses to confirm the Plan include (i) dismissal of the Bankruptcy Case; (ii) conversion of
the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code, which would entail
the mandatory appointment of a trustee; (iii) submission by CMB of an alternative plan or
the filing by another party in interest of an alternative or competing plan; and (iv) the
appointment of a Chapter 11 trustee for the purpose of operating CMB's business,
administering CMB's assets, and filing an alternative plan.

## XI.      RISK FACTORS

This Disclosure Statement contains forward-looking statements that involve risks and
uncertainties.  The following discussion is intended to be a non-exclusive summary of certain
of those risks and uncertainties.  Creditors should consider carefully these risks and are
encouraged to supplement this summary with their own analysis and evaluation of the Plan.

The Reorganized Debtor's business plan contemplates the achievement of certain
leasing goals.  It is, of course, impossible to predict accurately the results of future
operations.  The commercial real estate business is subject to substantial risks.  The principal
risks relate to the uncertainties in the real estate industry in general and to those in the
particular real estate markets in which the Reorganized Debtor will operate, as well as the
uncertain state of credit markets.  If the Reorganized Debtor is unable to achieve the

projected results, it may be unable to generate sufficient cash to fund its ongoing operations and perform its obligations to creditors under the Plan. Management believes, however, that its financial projections are based on reasonable assumptions and that the projected results are reasonably achievable.

**Governmental Regulation**. The real estate industry is subject to a variety of federal, state and local statutes, ordinances, rules and regulations. Such government regulation may result in increased costs.

**Uncertain Economic Conditions**. The United States economy in general and the state of Arizona in particular are experiencing a significant downturn. It is unclear at the present time when the economy will fully recover. Although CMB believes that the economy is in the process of stabilizing or soon will stabilize, it is impossible to know whether that belief is true or not.

**Competition**. The Reorganized Debtor will experience competition from other lessors. Competitors likely will continue attempts to take advantage of CMB's bankruptcy as a leasing tool.

## XII. FEDERAL TAX CONSEQUENCES OF THE PLAN

CIRCULAR 230 NOTICE: WE MUST INFORM YOU THAT TO ENSURE COMPLIANCE WITH THE REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, ANY FEDERAL TAX ADVICE CONTAINED IN THIS DOCUMENT RELATING TO FEDERAL TAXES, WAS NOT INTENDED OR WRITTEN TO BE USED OR RELIED UPON, AND IT CANNOT BE USED OR RELIED UPON, FOR THE PURPOSE OF AVOIDING TAX RELATED PENALTIES THAT MAY BE IMPOSED UNDER FEDERAL TAX LAW. UNDER THESE RULES, A TAXPAYER MAY RELY ON PROFESSIONAL ADVICE TO AVOID FEDERAL TAX PENALTIES ONLY IF THAT ADVICE IS REFLECTED IN A COMPREHENSIVE TAX OPINION THAT CONFORMS TO STRINGENT REQUIREMENTS UNDER FEDERAL LAW. THIS DISCUSSION WAS

**WRITTEN IN CONNECTION WITH THE DEBTOR SOLICITING ACCEPTANCES OF THE PLAN THROUGH THIS DISCLOSURE STATEMENT.**

**A.      Scope of Discussion.**

The following discussion summarizes in general terms certain material federal income tax consequences of the implementation of the Plan based upon existing provisions of the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), court decisions, and current administrative rulings and practice.  This summary does not address the federal income tax consequences of the Plan to holders of priority claims or of secured claims, nor does it address any state, local or foreign tax matters or the federal income tax consequences to certain types of creditors (including financial institutions, life insurance companies, tax exempt organizations and foreign taxpayers) to which special rules may apply.  No rulings or opinions have been or will be requested from the Internal Revenue Service with respect to any of the tax aspects of the Plan.  CMB is not making any representations regarding the particular tax consequences of confirmation and consummation of the Plan as to creditors or Interest holders, nor is CMB or its professionals rendering any form of legal opinion or tax advice as to such tax consequences.  The tax laws applicable to corporations in bankruptcy are complex and are subject to significant uncertainties.  Each creditor and shareholder is urged to consult his, her or its own tax advisor as to the consequences of the Plan under federal and applicable state, local and foreign tax laws. Accordingly, the following summary of federal income tax consequences of the Plan is for informational purposes only and should not be construed as tax advice.

**B.      Tax Consequences to the Reorganized Debtor.**

CMB is a limited liability company.  As such the debtor is generally not subject to federal income tax. Instead, debtor's owners are subject to federal and state income taxes on their income tax return on any income or losses generated by the debtor.

**1.      Cancellation of Debt and Reduction of Tax Attributes.**

In general, absent an exception, a debtor will realize and recognize cancellation of

debt ("COD") income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of cash paid, and (y) the fair market value of any new consideration given in satisfaction of such indebtedness.

A debtor will not, however, be required to include any amount of COD income in gross income if the debtor is under the jurisdiction of a court in a case under Chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD income that it excluded from gross income under Section 108 of the Internal Revenue Code. In general, tax attributes will be reduced in the following order: (1) net operating losses; (2) general business credits; (3) minimum tax credits; (4) capital loss carry forwards; (5) tax basis in assets; (6) passive activity losses and credits (7) and foreign tax credits. A debtor with COD income may elect first to reduce the basis of its depreciable assets under section 108(b)(5) of the Internal Revenue Code. Because the Plan provides that holders of Allowed Unsecured Claims will receive cash payments on account of their Claims, the amount of COD income, and accordingly the amount of tax attributes required to be reduced, will depend on the amount of those payments. Because all Claims will not be fully paid under the Plan, COD income will be realized by the Reorganized Debtor on the Effective Date of the Plan.

## C. Tax Consequences to Holders of General Unsecured Claims.

Pursuant to the Plan, holders of Allowed Unsecured Claims will receive one or more Cash distributions in full satisfaction of their Claims.

### 1. Gain or Loss.

In connection with the implementation of the Plan, each holder of an Allowed Unsecured Claim generally will recognize gain or loss for federal income tax purposes. The timing and amount of that gain or loss will depend upon a number of factors, including

whether the holder reports income as an accrual basis taxpayer or as a cash basis taxpayer, whether the holder will receive multiple distributions pursuant to the Plan and whether the Reorganized Debtor's obligation to make payments will be treated as a new debt obligation for federal income purposes.

In addition, the character of any gain or loss recognized by a creditor as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the creditor, whether the obligation from which the creditor's claim arose constitutes a capital asset in the hands of the creditor, whether the obligation from which the claim arose has been held for more than one year, the allocation of any distributions received between principal and unpaid accrued interest, whether and to what extent the creditor has previously claimed a bad debt deduction, and the extent (if any) to which interest may be imputed where multiple distributions are received.

## XIII.  CONCLUSION AND RECOMMENDATION

CMB believes that confirmation and implementation of the Plan is preferable to any alternative because it will provide the greatest recoveries to its creditors.  For this reason, CMB urges all creditors entitled to vote on the Plan to accept the Plan.

Dated:  April 8, 2011

**PERKINS COIE LLP**

By:  /s/ Richard M. Lorenzen (#006787)

Richard M. Lorenzen
2901 N. Central Avenue, Suite 2000
Phoenix, AZ  85012-2788

Attorneys for Debtor, CMB III, LLC

LEGAL20601779.1