Quarles & Brady LLP
Firm State Bar No. 00443100
Renaissance One
Two North Central Avenue
Phoenix, Arizona 85004-2391
TELEPHONE 602.229.5200

Attorneys for Union Fidelity Life Insurance
Company

Isaac M. Gabriel, Esq. (#021780)
isaac.gabriel@quarles.com
Arturo A. Thompson, Esq. (#025070)
arturo.thompson@quarles.com

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | In Proceedings Under Chapter 11 |
| C.M.B. III, L.L.C., | Case No. 2:10-bk-30496 |
| Debtor. | **UNION FIDELITY'S OBJECTION TO PLAN OF REORGANIZATION FILED BY THE DEBTOR** |
| | Hearing Date: May 19, 2011<br>Hearing Time: 10:00 a.m. |

UNION FIDELITY LIFE INSURANCE COMPANY ("Union Fidelity"), a secured creditor in the above-captioned Chapter 11 bankruptcy case of C.M.B. III, L.L.C. (the "Debtor"), hereby files this Objection in connection with the "Debtor's Plan of Reorganization" (the "Plan") [Docket No. 96]. As set forth below, the Plan cannot be confirmed under Bankruptcy Code §1129 for a multitude of reasons. Accordingly, Union Fidelity respectfully requests that the Court enter an order denying confirmation of the Plan and granting Union Fidelity's Motion For Stay Relief [Docket No. 57] which has been continued to the plan confirmation hearing date.

## I.    BACKGROUND.

The Debtor is a single asset real estate debtor that owns a mixed-use commercial/industrial complex located at 13450-13610 N. Black Canyon Freeway, Phoenix,

Quarles & Brady LLP

Arizona (the "Property"). The Property is comprised of three separate parcels--7A, 7B, and 7C. Parcels 7A and 7B each have a separate building of 334,594 and 352,046 square feet, respectively. Both of these buildings are used as office buildings, and are approximately 20% occupied. All of the Debtor's income is derived from rents generated by parcels 7A and 7B.[1]

On or about September 7, 2006, Union Fidelity made a loan to the Debtor evidenced by, among other things, a Promissory Note dated September 7, 2006, in the original principal amount of $18,000,000.00 (the "Note") executed by the Debtor in favor of Union Fidelity. The obligations owing under the Note are secured by a first priority lien and security interest in parcels 7A and 7B, and all rents (including postpetition rents, the "Rents") generated therefrom (collectively, the "Collateral").[2] All the documents memorializing the loan between Union Fidelity and the Debtor, including the security interest granted in the Collateral, are collectively referred to herein as the "Loan Documents."[3] Prepetition, the Debtor defaulted under the Loan Documents by (among other things) failing to make the payment due on August 1, 2010. The Debtor subsequently failed to make the September 1, 2010 payment as well. As of August 31, 2010, the Debtor was indebted to Union Fidelity for payments due under the Note in an amount not less than $17,033,009.78, including principal, accrued interest and late charges (the "Note Balance").

Postpetition, the Debtor has renewed certain leases with existing tenants. Accordingly, Union Fidelity has obtained a recent appraisal considers the existing state of the Property and which appraises parcels 7A and 7B in the amount of $12,470,000. See Appraisal effective as of May 12, 2011 attached hereto as Exhibit "A". The combined appraised value of

---

[1]     Parcel 7C is an 50,000 square foot industrial building which is presently unoccupied.

[2]     The Debtor has projected that as of May 31, 2011, the Debtor will have at least $730,000 in cash on hand from rents comprising cash collateral of Union Fidelity. By July 31, 2011, the cash on hand should be in excess of $1 million.

[3]     The background facts detailing the loan transaction are set forth in "Union Fidelity's Motion for Relief from Stay or, Alternatively, for Adequate Protection" [Docket No. 57] (the "Stay Relief Motion"), and copies of all of the relevant Loan Documents are attached thereto.

 QB\135106.00008\13306517.1

parcels 7A, 7B and 7C is $14,030,000. Id. In addition, as this Court is well aware, a Chapter 11 trustee with limited powers has been appointed to investigate and pursue approximately $1.4 million that was transferred from the Debtor to its member on the eve of bankruptcy, as well as other potential related company receivables that may be owing to the Debtor.

Through its Plan, the Debtor proposes to pay Union Fidelity $9.7 million on its secured claim, or the amount that Union Fidelity's secured claim is ultimately valued at by the Court. The Debtor's Plan also separately classifies Union Fidelity's unsecured deficiency claim from other unsecured claims, and contains numerous other deficiencies. As set forth below, and as will be demonstrated with evidence at the final confirmation hearing, the Debtor's Plan cannot be confirmed.

## II. THE DEBTOR'S PLAN FAILS TO PAY UNION FIDELITY THE VALUE OF ITS SECURED CLAIM IN VIOLATION OF §1129(b)(2)(A)(i)(II).

Bankruptcy Code §1129(b)(2)(A) provides that in order for a plan to be fair and equitable with respect to a secured claim, the plan must provide, among other things, that the secured claimant "receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value … of at least the value of such holder's interest in the estate's interest in such property." 11 U.S.C. §1129(b)(2)(A)(i)(II). This means, at minimum, Union Fidelity must be paid the value of its interest in the Debtor's real property consisting of parcels 7A and 7B.

However, parcels 7A and 7B also generate rents, and such rents comprise Union Fidelity's collateral as well pursuant to the Deed of Trust. The Ninth Circuit is an "addition to" circuit, meaning that Union Fidelity's secured claim consists of both the Property **and** all rents generated and accruing from the Property, including all postpetition rents. See, e.g., In re Ambanc La Mesa Limited Partnership, 115 F.3d 650 (9th Cir. 1997), cert. denied, 522 U.S. 1110 (1998); In re Patrician St. Joseph Partners, 169 B.R. 669 (D. Az. 1994); In re Arden Properties, 248 B.R. 164  (Bankr. D. Az. 2000); In re Paradise Springs Associates, 165 B.R. 913 (Bankr. D.

Quarles & Brady LLP

Az. 1993)); <u>see also</u> Stay Relief Motion at pp. 5-7 and the authorities cited therein.

In this case, Union Fidelity conducted an appraisal of the parcels 7A and 7B completed as of May , 2011 (the "UF Appraisal"). According to the UF Appraisal, parcels 7A and 7B, valued together, have an aggregate value of $12,470,000. <u>See</u> Exhibit "A". The Debtor has also obtained and disclosed an appraisal with an effective date of November 30, 2010 (the "CMB Appraisal"). The CMB Appraisal only appraised parcels 7A and 7B, giving them a combined fair market value of $10,000,000.[4] In addition, the Based on the Debtor's cash collateral budget for May, 2011, the Debtor asserts that the accrued rents in the Debtor's possession as of May 31, 2011 will be at least $730,000.

Notwithstanding that the Debtor's own appraisal values parcels 7A and 7B in the amount of $10,000,000, the Debtor inexplicably values Union Fidelity's secured claim in the amount of only $9,700,000 in the Plan. <u>See</u> Plan at Article 1 (defining "Union Secured Debt") and §5.2. While the Debtor provides a catch all phrase of "or such other amount as may be determined", the potential swing in value is substantial. Union Fidelity asserts that, as of the projected confirmation hearing, the Debtor will have over $1 million in Rents in its possession. Thus, Union Fidelity's asserted value of its Collateral is approximately $13.5 million. This obviously will have a substantial impact on any feasibility analysis and the Debtor's ability to service the indebtedness owed to Union Fidelity.

Simply stated, the Debtor's Plan fails to pay Union Fidelity the present value of all of Union Fidelity's collateral, inclusive of parcels 7A, 7B, and the accrued Rents, which renders the Debtor's feasibility analysis meaningless. Unless the Debtor pays Union Fidelity at least

---

[4]     Union Fidelity does not accept the valuation conclusion stated in the CMB Appraisal or agree with the methodology used by the Debtor's appraiser, and Union Fidelity reserves all of its evidentiary and legal objections related thereto. However, the key point (as set forth more fully below) is that even the Debtor's own appraisal provides a fair market value conclusion which is <u>*higher*</u> than the proposed treatment of Union Fidelity's secured claim in the Debtor's Plan.

Quarles & Brady LLP

$13.5 million on account of its secured claim, the Debtor's Plan will violate Bankruptcy Code §1129(b)(2)(A) and cannot be confirmed.

## III. THE PLAN SETS FORTH AN IMPROPER CLASSIFICATION SCHEME BY CLASSIFYING UNION FIDELITY'S UNSECURED CLAIM IN A CLASS SEPARATE AND APART FROM OTHER UNSECURED CLAIMS.

In the Debtor's Plan, the Debtor has classified Union Fidelity's unsecured claim in a separate class from the Debtor's other unsecured creditors, most of whom appear to be trade creditors. This is improper under the Bankruptcy Code and Ninth Circuit law.

Bankruptcy Code §1122 requires, as construed by case precedent, that "similar" claims be classified together, meaning that Union Fidelity's unsecured claim cannot be placed in a different class than the other unsecured claims that share the same legal character as Union Fidelity's unsecured claim. See In re Tucson Self-Storage, Inc., 166 B.R. 892, 898 (9th Cir. B.A.P. 1994), citing, among others, In re Fairfield Exec. Assoc., 161 B.R. 595, 600 n. 6 (D.N.J. 1993) ("Unsecured claims will, generally speaking, comprise one class, whether trade, tort, publicly held debt or a deficiency of a secured creditor, because they are claimants of equal legal rank entitled to share pro rata.").

In the Ninth Circuit, the focus in resolving the question of whether similar claims may be classified separately has been on the concept of "gerrymandering". See In re Barakat, 99 F.3d 1520, 1524-25 (9th Cir. 1996) ("There is one clear rule that emerges from the otherwise muddled caselaw on §1122 claims classification: thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan") (internal citation omitted). Barakat, which remains binding on courts within the Ninth Circuit, mandated that unsecured claims be classified together with other unsecured claims, and held that a debtor could not classify a mortgage deficiency claim arising under 1111(b) separately from the debtor's unsecured trade claims. In so holding, Barakat was merely the capstone in a line of cases turned out by the Ninth Circuit's Bankruptcy Appellate Panel, which also held that mortgage deficiency claims

QB\135106.00008\13306517.1

Quarles & Brady LLP

could not be classified separately from other unsecured claims.  See In re Montclair Retail Ct., 177 B.R. 663, 666 (9th Cir. B.A.P 1995); In re Tucson Self-Storage, Inc., 166 B.R. at 898.  The Barakat Court stated that "absent legitimate business or economic justification, it is impermissible for Debtor to classify [its mortgage lender's] deficiency claim separately from general unsecured claims." 99 F.3d at 1526.  However, even the "business justification" approach that the Barakat Court purportedly condoned was rejected on the facts of Barakat itself.  See 99 F.3d at 1528 (finding that trade creditors "essential" to the debtor's business could not be classified separately due to the existence of thousands of other trade creditors that could provide identical services); accord, In re Ambanc La Mesa Ltd. P'ship, 115 F.3d 650, 657 (9th Cir. 1997).

Applying these legal principals, it is apparent that the Debtor's Plan constitutes impermissible gerrymandering in its purest form.  The Plan classifies Union Fidelity's deficiency claim separately from the claims of other unsecured creditors without any business or economic justification for the separate classification.  Even if the Debtor were to allege such a justification, the Ninth Circuit has consistently been reluctant to allow separate classification on these grounds.  See Barakat at 1258.  Further, the separate classification is a transparent attempt to allow the Debtor to pay its trade creditors 80% of their unsecured claims, while paying Union Fidelity approximately 14% of its unsecured claim.  Undoubtedly, the Debtor is proposing such disparate treatment to permit the Debtor to obtain a consenting class of creditors being paid nearly in full, while the brunt of the Debtor's reorganization is borne almost exclusively (and improperly) by Union Fidelity.

The Debtor has suggested that the classification scheme is proper, notwithstanding that it violates Ninth Circuit law.  The Debtor points to *In re Loop 76, LLC*, 2010 WL 4823993 (D. Ariz. November 22, 2010) (Haines, J.) in support of its classification scheme.  However, *Loop 76* does not bind this Court (and in any event, is on appeal).  Further, *Loop 76* involved a secured creditor that had an unconditional guarantor who was solvent and had the ability to pay the

QB\135106.00008\13306517.1

secured creditor's deficiency claim.  In this case, Union Fidelity does not have an unconditional guarantor; rather, the only guaranty is a limited "bad boy" guaranty relating to claims like fraud, insurance proceed dissipation, etc.  A true and correct copy of the limited guaranty is attached hereto as Exhibit "B".  Currently, no liability has been established under the limited guaranty, and a complaint has not been filed under the limited guaranty.  In addition, even if such an action were filed, it would <u>not</u> involve a claim to pay the unsecured deficiency claim, but would be based on an entirely separate cause of action such as fraud against the principals of the Debtor. Even if *Loop 76* was properly reasoned and not in violation of Ninth Circuit law, it has zero application to this case.

Based on all of the foregoing, the Debtor's classification scheme set forth in the Plan is in clear violation of the Bankruptcy Code and established Ninth Circuit law.  Accordingly, the Debtor's Plan cannot be confirmed.

## IV.    **THE PLAN HAS NOT BEEN PROPOSED IN GOOD FAITH UNDER BANKRUPTCY CODE §1129(a)(3).**

Under §1129(a)(3), a plan must have been proposed in good faith in order for it to be confirmed.  In order to determine good faith, a court must inquire into the totality of the circumstances surrounding the plan, the application of the principals of fundamental fairness in dealing with creditors, and then decide whether the plan will fairly achieve a result consistent with the objectives and purposes of the Code.  <u>In re Linda Vista Cinemas, LLC</u>, No. 4:10-bk-14551-JMM, 2010 WL 2105613 at *12 (Bankr. D. Ariz. 2010) (citing <u>In re Sylmar Plaza, L.P.</u>, 314 F.3d 1070, 1074 (9th Cir. 2002)).

In this case, the Plan has not been proposed in good faith based on (i) the Debtor's gerrymandering of unsecured claims to attempt to obtain an impaired accepting class, and (ii) the Debtor's creation of a secured class on the eve of bankruptcy by obtaining a $100,000 loan that it did not need (in order to pay the retainer for Debtor's counsel), while at the same time transferring $1.4 million to its insiders (of which $100,000 could have been used for the retainer).

QB\135106.00008\13306517.1

Quarles & Brady LLP

**A.** **Gerrymandering Accepting Impaired Classes Constitutes Bad Faith.**

The Ninth Circuit has recognized that "the act of impairment in an attempt to gerrymander a voting class of creditors is indicative of bad faith." In re Hotel Assocs. of Tucson, 165 B.R. 470, 475 (9th Cir. BAP 1994); see also In re L&J Anaheim Assocs., 995 F.2d 940, 943 (9th Cir. 1993) (noting that the bankruptcy court should address manufacturing impaired class abuses by denying confirmation on the grounds that the plan has note been proposed in good faith).

As set forth above, and as the evidence will demonstrate at trial, the Debtor has gerrymandered the unsecured claims to attempt to create an impaired accepting class. As a single asset Debtor, the Debtor knew that it would not have an impaired accepting class unless it deliberately proceeded in violation of established Ninth Circuit law by improperly classifying Union Fidelity's unsecured claim in a separate class from other unsecured creditors. Therefore, the Debtor's Plan has not been proposed in good faith.

**B.** **The Debtor Schemed To Create An Impaired Secured Class On The Eve of Bankruptcy.**

Prior to August 5, 2010 (i.e., six weeks prior to the Petition Date), the Debtor had cash reserves of over $1.4 million. The Debtor has repeatedly asserted that these reserves did not comprise Union Fidelity's cash collateral and that the Debtor was free to use such reserves as it saw fit. This would have included using such funds to pay any retainer to counsel for a bankruptcy filing. Instead, however, from August 5th through August 20th, the Debtor transferred over $1.4 million to its insider member, CMB II, LLC. Based on these transfers and the questionable circumstances surrounding their legitimacy, the Court appointed a Chapter 11 trustee to investigate and pursue such transfers as well as other potential claims against related companies.

At the same time the Debtor was fraudulently (or preferentially) transferring funds to its insider, the Debtor contacted a friend (Lloyd Harvey) in late August or early September,

QB\135106.00008\13306517.1

2010. According to Mr. Harvey's testimony at his 2004 examination on May 12, 2011, Mr. Harvey and Mr. Tokoph were friends who occasionally golf together. Mr. Tokoph advised Mr. Harvey that he "needed $100,000" as a loan or investment, and that he would provide Mr. Harvey with a return better than what a bank would offer. Mr. Harvey did not know what he was investing in, what property would secure such loan or investment, or which entity his funds were being contributed to. Mr. Harvey simply knew that he was supposed to issue the check for $100,000. After his discussion with Mr. Tokoph, a representative of Mr. Tokoph called Mr. Harvey, and explained to him the "mechanics" of how to make the payment and who to make the payment to. Mr. Harvey received no documentation of any kind, a did not draft or review any loan documents or a deed of trust relating to his loan/investment.

Following his transmission of $100,000 to Mr. Tokoph (care of the Debtor), Mr. Tokoph recorded a $100,000 deed of trust on parcel 7C of the Debtor's Property in favor of Lloyd Harvey Investments, LLC. Mr. Harvey never saw the executed deed of trust and never received copies of the deed of trust or the note from Mr. Tokoph, except as attachment to pleadings send to Mr. Harvey after the Debtor sought bankruptcy protection. Effectively, Mr. Harvey had no idea what he was investing in or why, no idea that the Debtor was about to file for bankruptcy, no idea when the loan would be repaid; no idea if he would be monthly, yearly or in a lump sum; and no idea what the other terms of the loan were (except for a general idea of the interest rate).

Mr. Tokoph then purportedly used the $100,000 to pay the retainer for the Debtor's bankruptcy counsel in this case. However, the Debtor had no need for any loan from Mr. Harvey. The Debtor (and subsequently its owner, CMB II) had $1.4 million, from which it could have paid $100,000 for counsel's retainer. Instead, the Debtor fraudulently transferred the $1.4 million, and at the same time orchestrated a loan from Mr. Harvey to create an impaired accepting class. Prior to August, 2010, the Debtor had only two classes of creditors: Union Fidelity's secured claim, and less than $66,000 in unsecured claims. Union Fidelity's deficiency claim swamps all

other unsecured claims, and therefore Union Fidelity would have controlled all voting in this case making it impossible for the Debtor to confirm a plan. Thus, the Debtor obtained a loan from a friend on the eve of bankruptcy to create an impaired accepting class. The Debtor also proceeded to gerrymander the unsecured claims to make it appear that there is another potential voting class.

Based on the testimony from Mr. Harvey, it is clear that he is not a legitimate creditor of the Debtor. He simply gave Mr. Tokoph $100,000 as a loan or investment and had no idea what he was loaning against or in what entity. Mr. Tokoph could have used those funds for any entity or any purpose. Mr. Tokoph deliberately chose to "invest" those funds in the Debtor to create an impair accepting class. Mr. Harvey's testimony establishes that the Debtor has schemed in bad faith to create an impaired accepting class. This is the epitome of lack of good faith under §1129(a)(3) and as a result, the Debtor's Plan cannot be confirmed.

## V.    THE DEBTOR'S PLAN FAILS TO SATISFY THE BEST INTEREST OF CREDITORS TEST.

Bankruptcy Code §1129(a)(7) requires a plan of reorganization to provide creditors with payments equal to or greater than what they would otherwise receive in a Chapter 7 liquidation. In addition to considering the liquidation of the Debtor's physical assets, the liquidation analysis must also account for potential claims the estate holds, including avoidance actions. See, e.g. In re Affiliated Foods, Inc., 249 B.R. 770, (Bankr. W.D. Mo. 2000) (finding that Chapter 7 liquidation analysis must include potential recovery from fraudulent transfer or preference claims); In re Future Energy Corp., 83 B.R. 470, 489 n.33 (Bankr. S.D. Ohio 1988) (stating "in ascertaining what creditors would receive in a hypothetical Chapter 7 liquidation, the Court is required to assign a value to possible recoveries in actions to avoid preferential or fraudulent transfers"); cf. In re Best Products Co., 168 B.R. 35, 71-72 (Bankr. S.D. Ohio 1988) (court, in the context of confirming plan, analyzed hypothetical value of fraudulent transfer claims even though such claims had been settled).

QB\135106.00008\13306517.1

In this case, the Debtor's Plan falls well short of this standard. Based on the record in this case and the evidence that will be presented at a final confirmation hearing, the liquidation value of the Debtor's assets is, at minimum, as follows:

| Asset | Liquidation Value | Basis for Valuation |
|---|---|---|
| Parcels 7A, 7B & 7C | $14,030,000 | UF appraisal |
| Projected Rents as of July 31, 2011 | $1,000,000 | Operating Reports |
| Fraudulent Transfer/Preference Claim | $1,000,000 | Debtor's Statement of Financial Affairs [NOTE - this liquidation value is discounted to reflect fees/costs and a potential discount in the event of settlement] |
| Related Company Receivables | $1,792,793 | Debtor's tax return showing the following amounts owed:<br><br>CMB II, LLC: $1,348,835<br>DFRI: $337,367<br>MSCP, LLC: $76,759<br>GTC II $15,883<br>APREA $13,949 |
| Litigation Claim Against International Cruise & Excursion Gallery | $200,000 | Complaint filed by Debtor indicates "not less than $400,000" in damages. Thus, Union Fidelity is discounting this amount by 50% |
| **SUBTOTAL:** | **$18,022,793** | |
| Less 12% for liquidation costs/commissions/fees[5] | ($2,203,535) | |
| Less Admin Claims | ($200,000) | |
| Less Lloyd Harvey Secured Claim | ($100,000) | |
| Less Unsecured Claims | ($66,000) | |
| **CASH DISTRIBUTION TO UNION FIDELITY:** | **$15,453,258** | |

Based on the foregoing, even assuming a generous allocation for liquidation costs in the amount of 12% (on top of the discounts noted above), a liquidation of the Debtor's real property, rents, and collection of outstanding claims results in a net distribution of $15,453,258

---

[5]     Union Fidelity's use of 12% is illustrative and is merely used to add a conservative cost deduction for liquidation purposes. At the final confirmation hearing, Union Fidelity will present evidence of what actual costs will be in the event of a liquidation.

QB\135106.00008\13306517.1

for Union Fidelity <u>after paying all other creditors in full</u>. Conversely, under the Debtor's Plan, Union Fidelity will only be paid $9.7 million on its secured claim, and $1 million on its unsecured claim, for a total of $10.7 million. Under a realistic liquidation analysis, Union Fidelity would receive more in a liquidation than it is receiving under the Debtor's Plan. At minimum, Union Fidelity must receive total distributions of $15,453,258 for the Debtor's Plan to satisfy the best interest of creditors test set forth in §1129(a)(7). Because the Plan does not provide for such amount to be paid to Union Fidelity, the Plan cannot be confirmed.

## VI. THE DEBTOR'S PLAN IS NOT FAIR AND EQUITABLE BECAUSE IT VIOLATES THE ABSOLUTE PRIORITY RULE.

The Absolute Priority Rule provides that "old equity" interests cannot obtain "new equity" interests in the reorganized debtor solely on account of those old equity interests unless (i) all classes of claims consent, (ii) all unsecured claims are paid in full, or (iii) new value is provided. <u>See</u> 11 U.S.C. 1129(b); <u>Bank of America National Trust And Savings, Assoc. v. 203 North LaSalle Street Partnership</u>, 526 U.S. 434 (1999). In <u>North LaSalle</u>, the United States Supreme Court refused to acknowledge whether a "new value" exception even exists under the Bankruptcy Code. Accordingly, given the <u>North LaSalle</u> holding, the certain manner in which the Debtor's equity holder can retain his ownership interest is by paying unsecured creditors in full. Yet the Plan proposes to pay Union Fidelity approximately 14% of its unsecured claim. Such payment is not payment in full and therefore violates the Absolute Priority Rule.

Because the Plan plainly violates the general Absolute Priority Rule, the Plan can only be approved if it satisfies the "new value" exception or "corollary" (if this corollary even exists), which provides that old equity may retain an interest in the Debtor if the former equity holder provides new value to the reorganized debtor under the Plan. Such value must be: (1) new, (2) substantial, (3) in money or money's worth, (4) necessary for successful reorganization, and (5) reasonably equivalent to the value or interest received. <u>See</u> <u>In re Coltex Loop Central Three P'ners, L.P.</u>, 138 F.3d 39, 44-45 (2nd Cir. 1998) (questioning whether the "new value" exception

QB\135106.00008\13306517.1

Quarles & Brady LLP

Quarles & Brady LLP

1  still exists and discussing requirements for "new value" if the exception remains viable); <u>In re</u>

2  <u>Ambanc Las Mesa Ltd. Partnership,</u> 115 F.3d 650, 654 (9th Cir. 1997).

3        Further, under Ninth Circuit law, any purported new value "must be a present

4  contribution, taking place as of the effective date of the Plan rather than a future contribution." <u>In</u>

5  <u>re Ambanc La Mesa Ltd. P'shp,</u> 115 F.3d 650, 655 (9th Cir. 1997) (citing <u>In re Yasparro,</u> 100

6  B.R. 91, 96–97 (Bankr. M.D. Fla. 1989). The Ninth Circuit BAP has reiterated that a new value

7  contribution must be an "up-front" contribution that puts the equity-holders in risk. In <u>In re Sun</u>

8  <u>Valley Newspaper, Inc.,</u> the BAP, approvingly cited a holding from <u>In re Future Energy Corp.,</u>

9  noting that a "capital contribution exists when the transaction both benefits the debtor and places

10  the shareholder in a position of economic risk." <u>In re Sun Valley Newspaper, Inc.,</u> 171 B.R. 71,

11  78 (9th Cir. BAP 1994) (citing <u>In re Future Energy Corp.,</u> 83 B.R. 470, 498 (Bankr. S.D. Ohio

12  1988)).

13        In this case, the Debtor's equity member, CMB II, LLC, is purportedly paying $4.5

14  million as "new value" to attempt to satisfy the new value corollary, with $1 million of such funds

15  being paid to Union Fidelity on account of its unsecured claim and $150,000 covering unpaid

16  legal expenses and administrative claims. However, CMB II's alleged payment is largely illusory.

17  As noted above, CMB II, LLC received $1,405,000 from the Debtor on the eve of bankruptcy

18  constituting what appear to be avoidable transfers. In addition, the Debtor's books and records

19  reflect an outstanding account receivable (prior to the $1,405,000 transfer) in the amount of

20  $1,348,835. Thus, the CMB II already *owes* the Debtor approximately $2.75 million. New value

21  cannot be comprised of amounts paid to the Debtor which are already due and owing. <u>See, e.g.,</u>

22  <u>In re Sun Valley Newspaper, Inc.,</u> 171 B.R. at 78 (holding that equity-holders' cancellation of an

23  alleged debt owed to them was not an "up-front" contribution and was not the "sort of infusion of

24  new funds essential to the success of the undertaking contemplated by the new value exception.")

25

26

In addition, under the Plan, none of the $4.5 million will actually benefit creditors as of the effective date. The $1 million that is to be paid to Union Fidelity on the effective date is essentially a substitute for the accrued rents (approximately $1 million) which are part of Union Fidelity's collateral and are not being paid to Union Fidelity as part of its secured claim. The Debtor is simply giving Union Fidelity what it is already entitled to as a secured creditor by combining the $1 million payment on its unsecured claim with the $9.7 million for the real property collateral (which is still less than the CMB Appraisal). The remaining amount of the $4.5 million will be held in reserve by the reorganized Debtor (i.e., still controlled by CMB II) and perhaps used in the future to benefit the Property. The Plan contains no requirement that the reorganized Debtor actually use such funds. The Plan contains no restriction preventing the Debtor from redistributing the "reserve" back to CMB II at any point. Even if the reorganized Debtor did use such funds to improve the Property, this would only benefit the equity, as creditors do not receive the benefit of any increase in rents post-confirmation and no excess cash is being paid to creditors under the Plan.

The Debtor's "new value" is smoke and mirrors and is not new value at all. To the extent such money would actually be paid, it would be comprised of money already owed to the Debtor plus the equivalent of Union Fidelity's cash collateral plus some small reserve that could be immediately redistributed to CMB II. The Plan violates the Absolute Priority Rule, and the proposed payment from CMB II does not satisfy the new value corollary. Therefore, the Plan cannot be confirmed.

In addition, the Debtor has failed to expose the equity to the marketplace to determine what the equity is actually worth. Under the Plan, the Debtor proposes to retain all of the equity and all of the upside of leasing up the Property as well as the opportunity to pay its

insiders nearly <u>$300,000 per year</u> in management fees,[6] while only paying $1.15 million on the effective date (which, as noted above, does not even equal the amount the equity has stolen from the estate). The Debtor's Plan also contains no provision regarding excess cash flow, meaning if the Debtor is successful in leasing up the Property (as proposed), all excess cash flow will be distributed to equity and not creditors. Simply stated, this is not "fair and equitable" as required by §1129(b) and does not satisfy the absolute priority rule or the new value corollary.

The Debtor's feeble attempt to expose its equity to the marketplace through the onerous plan bidding procedures does not overcome this flaw. For example, even though CMB II is only proposing to pay $1.15 million as of the effective date for the benefit of creditors, the Debtor proposes to establish bidding procedures for third parties to purchase the Debtor's equity interest, with the opening bid <u>starting at $4.75 million</u>, i.e., $3.6 million *more* than what is being paid to creditors under the Plan on the effective date. The bidding requirements also require a bidder to demonstrate to the Debtor that it has the $4.5 million in hand at least 25 days prior to confirmation, which is interesting given that CMB II has not satisfied this requirement. Lastly, the bidding requirements also force any new equity member to complete and perform the Debtor's plan rather than being permitted to submit their own plan, including a sale plan. None of the foregoing is fair and equitable, and the absolute priority rule prevents confirmation of the Debtor's Plan

**VII.**   **THE PLAN DOES NOT PROPOSE TO PAY UNION FIDELITY A MARKET INTEREST RATE OR ESTABLISH A REASONABLE MATURITY DATE, AND THEREFORE IS NOT FAIR AND EQUITABLE.**

The Debtor's Plan does not comply with Section 1129(b) because it is not "fair and equitable". Not only does the Debtor propose a maturity date in eleven (11) years relating to the proposed restructure of Union Fidelity's secured claim, but the 5.5% *fixed* interest rate proposed

---

[6]   Union Fidelity will present evidence at a final evidentiary hearing regarding the amount of market rate management fees relating to the Property. Union Fidelity reserves its rights to seek disgorgement of excessive fees paid to the Debtor's insiders throughout this case.

by the Debtor is insufficient because the Debtor's Plan is conceived in such a way as to maximize risk to Union Fidelity. To be fair and equitable with respect to secured creditors, the Plan must comply with Bankruptcy Code § 1129(b)(2)(A)(i). This requires allowing Union Fidelity to (i) retain its liens on the Collateral in an amount equal to the allowed total amount of its claim; and (ii) receive cash payments which have a value equal to Union Fidelity's interest in the estate's interest in the Property as of the effective date of the Plan (*i.e.*, present value). 11 U.S.C. § 1129(b)(2)(A)(i). The "present value" prong requires an interest rate sufficient to account for the time value of money *and* to protect the creditor from the risk of deferred payments. See <u>Till v. SCS Credit Corp.</u>, 541 U.S. 465, 478-479 (2004) (requiring a risk adjustment in the interest rate applied to deferred cash payments in a cramdown plan); <u>In re Fowler</u>, 903 F.2d 694, 697-98 (9th Cir. 1990) (explaining that the appropriate interest rate is calculated by starting "with a base rate . . . and add[ing] a factor based on the risk of default and the nature of the security"); <u>In re Camino Real Landscape Maintenance Contractors, Inc.</u>, 818 F.2d 1503, 1504 (9th Cir. 1987) (reasoning that the appropriate interest rate is that which "the debtor would pay a commercial lender for a loan of equivalent amount and duration, considering the risk of default and any security"); <u>In re Marquez</u>, 270 B.R. 761, 769-72 (Bankr.D.Ariz. 2001) (recognizing that a lender's risk in commercial loans is higher than in consumer loans).

The United States Bankruptcy Court for the Central District of California recently issued a very instructive opinion explaining the determination of an interest rate in a case where the Chapter 11 debtor's business and reorganization revolved around a single asset. <u>In re Cobalis Corp.</u>, No. 8:07-bk-12347-TA (Bankr.C.D.Cal., April 7, 2010). The asset was not a real estate project, but a patent: the debtor's entire business was based on marketing the product protected by the patent, and the patent served as security for the debtor's $3.8 million loan from its largest creditor. *See id.* at p. 2-3. The debtor proposed to pay its secured creditor a 6.5% interest rate under its plan of reorganization. <u>Id</u>. at 5. In determining whether the debtor's plan met the

Quarles & Brady LLP

present value requirement for a cramdown confirmation, the court found that locking a lender in to a fixed (rather than variable) interest rate for a period of years also increases risk, due to the possibility of intervening inflationary periods. Id. The court also observed that there was no "market" that the court or the debtor could turn to in ascertaining an appropriate interest rate because there is no market for 100% loan-to-value loans. Id. at 17.

Given the lack of any market loans from which an appropriate interest rate could be determined, the court looked to Till and its "formula approach" in building up an interest rate from prime. Id. While admitting that it was unclear how Till applies to Chapter 11 cases,[7] the court adopted a formula approach, ultimately holding that a 20% per annum interest rate was an Appropriate Interest Rate. Id. at 18, 24. The court reasoned that the highly speculative nature of the debtor's success, the reliance of its business on a single asset that might prove worthless, a 100% loan to value ratio, and a fixed interest rate, justified an extremely high interest rate (as much as 30 to 35%). See id. at 15-24. The plan did, however, provide that upon default, the secured lender could repossess the collateral within ten days. Id. at 24. It was this provision alone that the court relied on in lowering the Appropriate Interest Rate to 20% per annum. Id. The court cited Till in acknowledging that "too high a rate might render a plan infeasible," but the "remedy in such a case [is] to simply deny confirmation on grounds of feasibility." Id. at 18.

In our case, the Debtor is proposing an interest rate (5.5%), amortization period (25 years), and maturity date (11 years) that would only be reserved for the strongest borrowers (and even then is likely a stretch in this market) and where a significant equity cushion would exist with respect to the subject property. This proposed treatment is not reflective of the risks

_____

[7] Notwithstanding the Court's comment, the Ninth Circuit has applied the formula approach used in Till in Chapter 11 cases for over twenty years. In re Fowler, 903 F.2d 694, 697-98 (9th Cir. 1990) (explaining that the appropriate interest rate is calculated by starting "with a base rate . . . and add[ing] a factor based on the risk of default and the nature of the security"); In re Camino Real Landscape Maintenance Contractors, Inc., 818 F.2d 1503, 1504 (9th Cir. 1987) (reasoning that the appropriate interest rate is that which "the debtor would pay a commercial lender for a loan of equivalent amount and duration, considering the risk of default and any security"). Till only serves to confirm the validity of what has been the traditional approach in this Circuit.

Quarles & Brady LLP

being borne by Union Fidelity in this case, where the secured claim will have a 100% loan-to-value ratio. Because of the proposed low interest rate and extended amortization period and maturity date, if Union Fidelity's secured claim is valued at $9.7 million, the Debtor will only have paid *approximately 28% of the principal balance* over 11 years and balloon in excess of $6.9 million will be due upon maturity. Similarly, if Union Fidelity's secured claim is valued at $13.5 million (per the UF Appraisal), the Debtor will only have paid *approximately 28% of the principal balance* over 11 years and balloon in excess of $9.6 million will be due upon maturity. The Debtor has demonstrated consistently its inability to lease up and stabilize the Property (it is currently 20% occupied), yet the Debtor seeks to string-out Union Fidelity's secured claim over eleven (11) years on extremely favorable terms to the Debtor, leaving a massive balloon payment for the end of the eleventh year. The proposed interest rate, maturity date, and amortization period shift nearly all of the risk of reorganization to Union Fidelity, and the plan is not fair and equitable.[8]

Union Fidelity will present expert testimony at the confirmation trial on the appropriate interest rate, maturity date, and amortization period that should be applied to the Union Fidelity's secured claim. Such expert testimony will show, among other things, (i) a 5.5% *fixed* interest rate does not adequately compensate Union Fidelity for the risks inherent in the eleven-year loan proposed by the Plan, (ii) the fixed interest rate term also adds risk to the forced loan, as does the 100% loan-to-value nature of the loan. See Cobalis at 16-17. The interest rate to be applied by the Debtor must therefore dramatically increase to allow the Debtor to repay Union Fidelity's claim in accordance with §1129(b). At a minimum, the lion's share of the claim must be paid down over the life of the Plan rather than being deferred to the end of the Plan term.

---

[8] The Plan is also not fair and equitable because, in the event the Debtor does lease up the Property and generate excess cash, all such cash may be distributed directly to the Debtor's members rather than being paid to creditors. Thus, during the Plan term, all of the upside is reserved for the Debtor's insiders, whereas all of the risk is being borne by Union Fidelity.

Quarles & Brady LLP

1    Otherwise, the Debtor cannot satisfy <u>Till</u> by providing "present value" on Mortgage Lender's

2    claim.

3            Moreover, the variables relating to the amount of Union Fidelity's secured claim

4    and the appropriate interest rate and amortization period create dramatic potential swings in

5    payments that will be owed to Union Fidelity.  As discussed below, this will affect the feasibility

6    of the Plan and render the Debtor's projections meaningless.

7    **VIII.   THE PLAN CANNOT BE CONFIRMED BECAUSE IT VIOLATES 11 U.S.C.
         § 1129(A)(5).**

8

9            A plan must disclose sufficient information relating to post-confirmation

10   management and insiders (to the extent they are individuals), and their proposed compensation;

11   additionally, the retention of prepetition management must be "consistent with the interests of

12   creditors and equity holders and with public policy."   11 U.S.C. § 1129(a)(5); <u>see</u> <u>In re</u>

13   <u>Beyond.com Corp.</u>, 289 B.R. 138, 144 (Bankr. N.D. Cal. 2003) (explaining that Section 1125(a)

14   is "a blend of disclosure and substantive requirements," which enable the court to make "a

15   substantive determination . . . whether post-confirmation management serves the interests of

16   creditors . . . and is consistent with public policy") (citing 7 *Collier on Bankruptcy* ¶ 1129.03[5]

17   (15th ed.)). The retention of pre-petition management is "inconsistent with the interests of

18   creditors, equity security holders, and public policy if it . . . perpetuates incompetence, lack of

19   discretion, inexperience, or affiliations with groups inimical to the best interests of the debtor."

20   <u>See</u> <u>id</u>. at 145 (denying confirmation of Chapter 11 plan when the Debtor failed to disclose

21   sufficient information regarding management and insiders).

22           Here, the Plan also fails to set forth or otherwise limit the compensation that will

23   be paid to that insider in contravention of 1129(a)(5)(B).  While the Debtor's projections attached

24   to the First Amended Disclosure Statement reflect a line item for management fees, there is no

25   provision in the Plan governing the amounts to be paid to DFRI, the Debtor's manager.

26

Prepetition, the "management" fees paid to DFRI were wildly inconsistent and appear to reflect the whims of the Debtor's insider, Jerry Tokoph, who is the 100% owner of DFRI. The proposed compensation to DFRI is not constrained (or disclosed) by the Plan in any respect. Accordingly, the Plan should not be confirmed.

Further, it is questionable as to whether DFRI should be permitted to continue as manager. DFRI is the same entity that (i) allowed the Debtor to transfer $1.4 million to CMB II on the even of bankruptcy, (ii) failed to collect related company receivables, and (iii) has failed to lease up or otherwise stabilize the Property historically. Despite this, DFRI is currently paying itself management fees in the amount of nearly 10% of monthly rent generation -- an amount that far exceeds competitors' fees. Accordingly, the final confirmation hearing should also address the propriety of allowing DFRI to continue to manage the Debtor and the proper management fee that should be paid to any manager of the Debtor.

## IX.  THE DEBTOR'S PLAN IS NOT FEASIBLE AND UNION FIDELITY RESERVES ALL OF ITS OBJECTIONS ON FEASIBILITY.

A Plan may not be confirmed if it is "likely to be followed by . . . liquidation, or the need for further financial reorganization." 11 U.S.C. § 1129(a)(11); In re Acequia, Inc., 787 F.2d 1352, 1364 (9th Cir.1986); In re Pizza of Hawaii, Inc., 761 F.2d 1374, 1382 (9th Cir. 1985) (denying confirmation of Chapter 11 plan for, among other things, lack of feasibility; explaining that "[t]he purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation") (citing 5 *Collier on Bankruptcy* ¶ 1129.02[11] (15th ed.)); In re Beyond.com Corp., 289 B.R. at 145-46  ("The feasibility requirement requires courts to scrutinize carefully the plan to determine whether it offers a reasonable prospect of success and is workable.").

The Debtor's own projections (even assuming Union Fidelity's secured claim will be $9.7 million) show significant shortfalls in cash for the first two years of the Debtor's Plan.

Thus, to overcome this shortfall, the Debtor must receive the $4.5 million cash infusion from CMB II. However, CMB II has not submitted <u>any</u> evidence that it has the ability to fund $4.5 million on the effective date of the Plan. Further, as noted above, the $4.5 million to be contributed by CMB II is not required to remain with the Debtor and may be distributed back to CMB II at any time. The Debtor has not met its burden of demonstrating that the Plan, as currently proposed, is feasible.

Moreover, depending on the ultimate determined value of Union Fidelity's secured claim, the appropriate interest rate, and the amortization period, the payments that will be owed under the Plan comprise a substantial range which will greatly affect feasibility. The following table shows the potential difference in payments depending on valuation, interest rate, and amortization period:

| Secured Claim | Interest Rate | Amort. Period | Monthly Payment |
|---|---|---|---|
| $9,700,000 | 5.5% | 25 years | $59,566 |
| $9,700,000 | 6.5% | 25 years | $65,495 |
| $9,700,000 | 7.5% | 25 years | $71,682 |
| $9,700,000 | 7.5% | *20 years* | $78,142 |
| $9,700,000 | 8.5% | 25 years | $78,107 |
| $13,500,000 | 5.5% | 25 years | $82,901 |
| $13,500,000 | 6.5% | 25 years | $91,152 |
| $13,500,000 | 7.5% | 25 years | $99,763 |
| $13,500,000 | 7.5% | *20 years* | $108,755 |

Even if the Debtor could demonstrate that Union Fidelity's secured claim is $9.7 million (and it is virtually certain the Debtor cannot demonstrate this), an interest rate of 7.5% or 8.5% would increase the monthly payment by $12,000 - $17,000. A shorter (and more

QB\135106.00008\13306517.1

Quarles & Brady LLP

appropriate) amortization rate would similarly increase the payment. Thus, the yearly payment increase to Union Fidelity could be in the range of $140,000 - $260,000. If Union Fidelity's claim is determined to be $13,500,000, then the yearly payments increase to anywhere from $250,000 to $550,000. Given that the Property already projects substantial shortfalls for the first two years of the Plan, if the Debtor fails in obtaining new leases (something the Debtor historically has not done), the Plan becomes wildly infeasible. This risk also illustrates why the proposed interest rate of 5.5% is far too low in this case.

At the final confirmation hearing, Union Fidelity will present expert and other testimony regarding the feasibility of the Debtor's plan, the reserves required to maintain the Property, the projected expenses and tenant improvement costs, and the resulting cash flow issues depending on the value attributed to Union Fidelity's secured claim (and interest rate and amortization period). If the Debtor cannot meet its burden of demonstrating feasibility, the Plan cannot be confirmed.

**X.    CONCLUSION**.

Based on all of the foregoing, Union Fidelity respectfully requests that the Court enter an Order:

A.    Denying confirmation of the Plan;

B.    Granting the relief requested in Union Fidelity's Stay Relief Motion; and

…

…

…

QB\135106.00008\13306517.1

C. Granting Union Fidelity such other and further relief as the Court deems just and proper under the facts and circumstances of this case.

RESPECTFULLY SUBMITTED this 12th day of May, 2011.

QUARLES & BRADY LLP
Renaissance One
Two North Central Avenue
Phoenix, AZ 85004-2391


By /s/ Isaac M. Gabriel
  Isaac M. Gabriel
  Arturo A. Thompson

Attorneys for Union Fidelity Life Insurance Company

COPIES of the foregoing sent via
e-mail this 12th day of May, 2011, to:

Richard M. Lorenzen
Perkins Coie LLP
2901 N. Central Avenue
Suite 2000
Phoenix, AZ 85012-2788
Email: rlorenzen@perkinscoie.com
*Attorneys for Debtor*

Office of the U.S. Trustee
Attn: Patty Chan
230 N. First Avenue, Suite 204
Phoenix, AZ 85003
E-mail: Patty.Chan@usdoj.gov

Maureen Gaughan
P.O. Box 6729
Chandler, AZ 85246
Email: maureen@mgaughan.com
*Chapter 11 Trustee*

Quarles & Brady LLP

QB\135106.00008\13306517.1

Quarles & Brady LLP

1   John J. Fries
    RYLEY CARLOCK & APPLEWHITE
2   One North Central Avenue, Suite 1200
    Phoenix, Arizona  85004-4417
3   jfries@rcalaw.com
    *Attorneys for Maureen Gaughan,*
4   *Chapter 11 Trustee*

5
            /s/Vicky Shelby
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

QB\135106.00008\13306517.1